**UNITED STATES of America, Appellee**

v.

**Antone R. WHITE, a/k/a Tone, Appellant.**

**Nos. 94–3063 to 94–3066.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 24, 1997.

Decided June 27, 1997.

---

Neil H. Jaffee, Assistant Federal Public Defender, argued the cause, for appellant Antone R. White. With him on the briefs was A.J. Kramer, Federal Public Defender, Washington, DC.

Diane S. Lepley, appointed by the court, argued the cause and filed the briefs, for appellant Ronald R. Hughes.

Joseph J. Gigliotti, appointed by the court, argued the cause and filed the briefs for appellant Eric A. Hicks.

John A. Briley, Jr., Pittsburgh, PA, appointed by the court, argued the cause and filed the briefs, for appellant Dan R. Hutchinson.

All counsel for appellants were also on the joint briefs.

Geoffrey G. Bestor and Steven E. Rindner, Assistant U.S. Attorneys, argued the cause, for appellee. With them on the brief were Eric H. Holder, Jr., U.S. Attorney, John R. Fisher, Leanne Shaltis Fallin, and Michael L. Volkov, Assistant U.S. Attorneys. Elizabeth Trosman, Assistant U.S. Attorney, Washington, DC, entered an appearance.

Before: WILLIAMS, HENDERSON and TATEL, Circuit Judges.

Opinion for the court filed PER CURIAM.

PER CURIAM:[1]

Four appellants, members of the First Street Crew, challenge their convictions and sentences for drug conspiracy and related crimes. We affirm.

I

Viewed in the light most favorable to the Government, see, e.g., *United States v. Rawlings,* 73 F.3d 1145, 1146 (D.C.Cir.1996), the evidence presented at trial established the following: Antone White and several friends, including Eric Hicks and Dan Hutchinson, sold crack cocaine in the area of First and Thomas Streets, N.W., from early 1988 until March 1993. Although White initially sold small amounts of cocaine, he soon became a wholesale supplier, selling "weight," or large amounts of crack, and fronting his cohorts smaller amounts of cocaine to sell for him. Ronald Hughes and Derrick Ballard began working with White in 1990. Together, White and his partners were known as the "First Street Crew."

Members of the First Street Crew worked together when they sold drugs. They referred customers to each other, watched out for each other to protect against police or robbers, changed money with each other to thwart attempts to trace marked bills, used common stash areas, and cut up drugs at the same house. Although White orchestrated the group's activities, Hicks took charge when, as the prosecution put it, White was "out of the neighborhood," i.e., in prison.

The Crew's drug operation and violent activities, along with the youth of the Crew's members—few were over twenty-five years old, and White employed several juveniles to hold and run drugs for him—caught the attention of the United States Attorney's office and the Metropolitan Police Department. In August 1992, an acquaintance of White, Arvell Williams, walked into an Assistant United States Attorney's office and offered his help in investigating the First Street Crew. Sergeant Dale Sutherland, an undercover officer with the Metropolitan Police Department, became Williams's primary contact. Sutherland and Williams arranged six drug purchases from members of the First Street Crew, on August 14, 19, and 21, September 3 and 8, and October 2, 1992. On several of those occasions, Williams wore a concealed tape recording device called a "NAGRA." Williams bought crack from Hutchinson, White, and other members of the First Street Crew.

Some time after the September 8 transaction, White began suspecting that Williams was "hot," i.e., that he was working for the police, and that Sutherland was an undercover officer. Williams made his last purchase from White on October 2. Returning to the undercover vehicle, Williams, visibly shaken, told one police officer that White would not talk to him.

On October 5, Williams and Officer Sutherland arranged to purchase crack cocaine from Hicks and Derrick Ballard. The next afternoon, while waiting for Ballard in the passenger seat of Ballard's car, Williams was shot sixteen times at close range by two armed men who ran out of a nearby alley. Williams was pronounced dead on the scene. Several witnesses identified the shooters as White and Hughes.

In March 1993, White, Hicks, Hughes, Hutchinson, and Ballard were charged in a twenty-six-count indictment with conspiracy

---

1. Judge Williams authored sections II.A, II.B, and II.C on the admission of out-of-court statements, joint trial, and claims based on timing of disclosure of witnesses and impeachment materi-

al. Judge Tatel authored section I and sections II.D, II.E, II.F, and II.G on limits on cross-examination, admission of audiotapes, testimony of Detective Rawls, and proof of age.

to distribute cocaine base, RICO conspiracy, and numerous individual counts of drug distribution. White and Hicks were charged with engaging in a continuing criminal enterprise (CCE). Hicks was also charged with using or carrying a firearm in relation to a drug trafficking crime, a violation of 18 U.S.C. § 924(c) (Supp.1996). White and Hughes were charged with the murder of Arvell Williams in furtherance of a CCE, first-degree murder while armed, using and carrying a firearm in relation to a drug trafficking crime, and possession of a firearm during a crime of violence.

Prior to trial, the prosecution filed a motion to admit out-of-court statements made by Arvell Williams during debriefing sessions and before and after drug transactions, arguing that since defendants had "procured Williams's unavailability"—that is, killed him—they had waived their confrontation rights and hearsay objections to Williams's statements. At a motions hearing in October 1993, the prosecution presented, through a police detective, the testimony of several eyewitnesses to the shooting. Finding that the Government had proved by a preponderance of the evidence that Hughes, White, and Ballard conspired to murder Williams, the court ruled that those three defendants had waived their confrontation rights and hearsay objections to Williams's statements. *United States v. White*, 838 F.Supp. 618, 624 (D.D.C.1993). The court ruled that none of Williams's statements could be used against Hicks and Hutchinson, who, the prosecution eventually conceded, had not waived their confrontation rights. *Id.* & n. 8.

After the district court granted the Government's motion to admit Williams's statements against White, Hughes, and Ballard, Hicks and Hutchinson filed motions to sever their trial from the others. Denying the motion to sever, the trial court found the Government's offer to redact any of Williams's statements that mentioned Hicks, Hutchinson, the "Crew," or the "First Street Crew," along with its own intention to give a limiting instruction on the use of Williams's testimony, sufficient to prevent prejudice to Hicks and Hutchinson.

Trial began on November 8, 1993. In late December, Derrick Ballard pled guilty to drug conspiracy and assault charges. In late January 1994, the Government rested its case. Following defendants' motions for judgment of acquittal, the district court dismissed the RICO conspiracy charges against Hutchinson and Hughes.

On January 28, 1994, the case went to the jury. Three weeks later, the jury returned verdicts on some of the charges in the indictment, finding White, Hughes, Hicks and Hutchinson guilty of conspiracy to distribute crack cocaine, White and Hicks guilty of RICO conspiracy, and all four defendants guilty of individual counts of distribution. The jury acquitted Hicks of the section 924(c) charge. Continuing its deliberations on the remaining charges, the jury was unable to reach consensus. In early March, the district court declared a mistrial on the remaining counts of the indictment.

Several weeks later, defendants filed a motion for a new trial, relying on an affidavit from the jury foreperson stating that "[i]n the course of our jury deliberations," one of the jurors had told the others that she had spoken with a Government witness's sister, who had told her that a potential Government witness had been killed during the trial and that "Antone White and his group were responsible for her death." Joint Mot. For New Trial (Mar. 31, 1994), Attach. 1. In opposition, the prosecution submitted affidavits from the government witness's four sisters stating that they knew no jurors nor anything about the murder of another government witness, along with a second affidavit from the foreperson attesting that the juror's statement came in late February, *after* the jury had returned its partial verdicts. The district court denied defendants' new trial motion.

White was sentenced to life in prison on the drug conspiracy count, to run concurrently with a life sentence on the RICO conspiracy count and with 240– and 480–month sentences on individual drug distribution and aiding and abetting counts. Hicks received the same sentence. Hughes received a life sentence on the drug conspiracy count, to run concurrently with 240–month sentences

on each of three drug distribution counts. Hutchinson was sentenced to 300 months in prison on the drug conspiracy count, to run concurrently with 300–month sentences on each of two drug distribution counts.

## II

### A. Admission of Out–of–Court Statements

■ The defendants make a number of challenges to the admission of the out-of-court statements of Arvell Williams, the potential witness whose absence defendants procured by murder. They claim that the government should have been required to prove the misconduct—a curiously bloodless term, in this context—that led to the loss of their Sixth Amendment confrontation rights by clear and convincing evidence, rather than merely by a preponderance. They also argue that, even if the trial court correctly resolved the confrontation clause issue, it should have excluded the hearsay as inherently unreliable. Finally, they object to the court's exclusive reliance on hearsay evidence in its *initial* finding that defendants had dispatched Williams, and to the sequence the court followed in determining admissibility.

■ The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Even though the right of confrontation is both constitutional and critical to the integrity of the fact-finding process, see *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930 1934, 26 L.Ed.2d 489 (1970), the defendant may lose it through misconduct. *Illinois v. Allen*, 397 U.S. 337, 343, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970) (finding loss of confrontation right where defendant engaged in disruptive behavior and had to be removed from courtroom). It is hard to imagine a form of misconduct more extreme than the murder of a potential witness. Simple equity

supports a forfeiture principle, as does a common sense attention to the need for fit incentives. The defendant who has removed an adverse witness is in a weak position to complain about losing the chance to cross-examine him. And where a defendant has silenced a witness through the use of threats, violence or murder, admission of the victim's prior statements at least partially offsets the perpetrator's rewards for his misconduct. We have no hesitation in finding, in league with all circuits to have considered the matter, that a defendant who wrongfully procures the absence of a witness or potential witness may not assert confrontation rights as to that witness. See *United States v. Houlihan*, 92 F.3d 1271, 1279 (1st Cir.1996) (murder); *United States v. Aguiar*, 975 F.2d 45, 47 (2d Cir.1992) (threats); *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir.1985) (murder); *Steele v. Taylor*, 684 F.2d 1193, 1202 (6th Cir.1982) (defendant pimp used influence and control over prostitute to induce her to refuse to testify); *United States v. Thevis*, 665 F.2d 616, 630 (5th Cir. Unit B 1982) (murder); *United States v. Balano*, 618 F.2d 624, 628 (10th Cir.1979) (threat); *United States v. Carlson*, 547 F.2d 1346, 1360 (8th Cir.1976) (threat).

■ The district court expressly found that the correct burden of proof for the procurement finding was preponderance of the evidence, although it made a back-up finding that there was clear and convincing evidence as to White and Hughes. *United States v. White*, 838 F.Supp. 618, 623–24 (D.D.C.1993).[2] Defendants rest their claim to the clear and convincing standard mainly on the Fifth Circuit decision in *Thevis*, 665 F.2d at 631, while the government urges us to follow a host of circuit court decisions requiring only a preponderance of the evidence. *Houlihan*, 92 F.3d at 1280; *Aguiar*, 975 F.2d at 47; *United States v. Mastrangelo*, 693 F.2d 269, 273 (2d Cir.1982); *Steele*,

---

2. The government attributed the murder only to White, Hughes and Ballard. Because Ballard pled guilty in the middle of trial, it might seem that the back-up "clear and convincing" finding as to White and Hughes would moot the standard of proof issue. But defendants challenge the court's finding on a factual basis, and it is appropriate for us, in conducting that review, to be clear on the standard that the district court was to apply. Our review of the district court's factual finding, of course, is for clear error. Cf. *United States v. Lewis*, 921 F.2d 1294, 1301 (D.C.Cir.1990) (holding that "[b]ecause of the fact-bound nature of the inquiry," determination of voluntariness of consent to search is reviewed for clear error).

684 F.2d at 1202; *Balano,* 618 F.2d at 629–30.

In *Thevis* the court noted that a loss of confrontation rights might expose the defendant to a risk of conviction by unreliable evidence, as does a courtroom identification following a possibly flawed out-of-court line-up identification. 665 F.2d at 631. From this similarity, it reasoned that the standard of proof required to show a reliable, independent basis for a possibly tainted identification, i.e., clear and convincing evidence, *United States v. Wade,* 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967), should also govern the forfeiture determination. See *Thevis,* 665 F.2d at 631.

We agree, however, with the other circuits. Although the main purpose of the confrontation clause is to ensure the reliability of the evidence, it does not follow that every ruling on every related issue, even if it may expose the defendant to uncross-examined testimony, must rest on clear and convincing evidence. See *Mastrangelo,* 693 F.2d at 273. The forfeiture principle, as distinct from the confrontation clause, is designed to prevent a defendant from thwarting the normal operation of the criminal justice system. As the district court noted, the forfeiture finding is the functional equivalent of the predicate factual finding that a court must make before admitting hearsay under the co-conspirator exception. See *White,* 838 F.Supp. at 624; see also *Houlihan,* 92 F.3d at 1280; *Steele,* 684 F.2d at 1202. Under Fed.R.Evid. 801(d)(2)(E), the government need prove its threshold burden for that purpose—that a defendant and the declarant who made the out-of-court statement participated in a single conspiracy and that the statement was made during and in furtherance of that conspiracy—only by a preponderance. *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987). Although *Bourjaily* does not expressly consider the standard of proof on a confrontation clause claim, the discussion does cite constitutional cases liberally in selecting the preponderance standard, and a later passage in the decision rejects a generalized claim that the admission of co-conspirator statements under Rule 801(d)(2)(E) violates that clause.

*Id.* at 181–84, 107 S.Ct. at 2781–83. As a higher standard of proof under the forfeiture doctrine would not actually separate out the more from the less reliable hearsay and admit only the former (it would simply reduce the scope of the doctrine's application), and as the public interest in deterring this sort of mischief is great, we think it correct to use the same standard as is used for coconspirators' statements.

■ Once Williams's testimony clears the Sixth Amendment hurdle, the rule against hearsay poses no further obstacle to admission. Some courts have assumed that the hearsay rule still applies, but have admitted the statements under Fed.R.Evid. 804(b)(5), which allows admission where the declarant is unavailable, there are adequate circumstantial guarantees of trustworthiness, and certain other criteria are satisfied. See *Rouco,* 765 F.2d at 994; *Carlson,* 547 F.2d at 1354–55. More commonly, however, courts have taken the view of the trial court here, see *White,* 838 F.Supp. at 621, that misconduct leading to the loss of confrontation rights also necessarily causes the defendant to forfeit hearsay objections. See *Houlihan,* 92 F.3d at 1281–82; *Mastrangelo,* 693 F.2d at 272; *Thevis,* 665 F.2d at 632–33; *Balano,* 618 F.2d at 626.

Again we think the majority view the better one. Because both the hearsay rule and the confrontation clause are designed to protect against the dangers of using out-of-court declarations as proof, a defendant's actions that make it necessary for the government to resort to such proof should be construed as a forfeiture of the protections afforded under both. Both the clause and the rule incorporate a preference for testimony tested by cross-examination, given under oath with the attendant penalty for perjury, and uttered before a jury able to observe the witness's demeanor. See *California v. Green,* 399 U.S. 149, 155, 157–58, 90 S.Ct. 1930, 1933, 1934–35, 26 L.Ed.2d 489 (1970) (finding that "hearsay rules and the Confrontation Clause are generally designed to protect similar values"); *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); Fed. R.Evid. Advisory Committee's Introductory Note on the Hearsay Problem, *quoted in* 4

*Weinstein's Evidence* 800–2 (1996). The same equity and policy considerations apply with even more force to a rule of evidence without constitutional weight. A new Federal Rule of Evidence, Rule 804(b)(6), scheduled to take effect December 1, 1997, codifies the majority view by establishing an explicit new exception. See Proposed Amendment to Federal Rule of Evidence 804(b)(6), 65 U.S.L.W. 4252 (U.S. April 11, 1997).

Defendants claim that even if their rights under the hearsay rule were forfeited, the district court should have more intensively screened Williams's statements for reliability. In so far as they mean that the trial court should have looked for the sort of indicia of trustworthiness that often support an exception to the confrontation or hearsay rules, see *Ohio v. Roberts*, 448 U.S. at 65–66, 100 S.Ct. at 2538–39; Fed.R.Evid. 804(b)(5), we reject the claim. The government should be no worse off than if defendants had not murdered Williams, yet defendants' proposal would do just that. The trial court properly ruled that the forfeiture would cover only the first layer of hearsay, allowing admission of those statements that would have been admissible if Williams himself had made them on the witness stand, no more and no less. *White*, 838 F.Supp. at 625.[3]

At the preliminary hearing, the trial court heard testimony on the circumstances under which Williams made the statements to the police, whether they were based on firsthand knowledge, and how they were recorded. *White*, 838F.Supp. at 625. This was to serve as a basis for evidentiary objections later on at trial, which defense counsel were as free to make as if Williams had taken the stand. In the course of trial, the defense made one request to exclude Williams's hearsay on reliability grounds, which the judge denied. See Tr. 11/17/93 at 1082–83. The factors which supposedly undermined Williams's reliability were standard imperfections for a witness of his sort—impure motives and side deals with another drug dealer from whom he had made undercover purchases. Rather than warranting wholesale

exclusion, these objections were for the jury to consider in deciding what weight (if any) to give Williams's statements. Similarly, defendants were free to move for exclusion under Rule 403 based upon the lack of reliability of the agents who relayed Williams's testimony, but they have identified no trial court error on that score. Thus the evidence did not fall short of the minimal reliability standards of constitutional due process and Fed.R.Evid. 403.

The defendants also pose a series of objections to the procedure employed by the trial court in deciding whether the forfeiture rule was applicable. The court held an *initial* hearing, outside the presence of the jury, at which a police detective, Schwartz, relayed to the court the statements of various persons with evidence that defendants White and Hughes murdered Williams. For security reasons—potential witnesses had been threatened, assaulted, even murdered—Schwartz withheld the names of these hearsay declarants, but he supplied information on their prior convictions and the deals made in return for their cooperation, thus affording the defense some ground for cross-examination and impeachment. See *White*, 838 F.Supp. at 622. On this basis, the court made a preliminary—and explicitly contingent—ruling of admissibility, subject to revision in the event that the declarants' actual testimony proved inadequate. Later, before the jury, the government put on Williams's statements as proof of the individual drug transactions he had arranged. Still later, it put on the Williams murder witnesses, whose testimony had earlier been supplied to the court via Schwartz; this not only constituted the government's evidence against defendants on the substantive murder counts, but also afforded defendants the opportunity to test the credibility of those witnesses for purposes of the forfeiture determination. As it proved, some of the evidence was so questionable that the jury was unable to reach a verdict on the murder counts. To take one example, the one eyewitness to identify both White and Hughes as the individuals who shot Williams stated, when she took the

---

**3.** To the extent that *Thevis* endorses defendants' position, we disagree. See *Thevis*, 665 F.2d at 633 n. 17 (observing that even where defendant forfeits confrontation rights, lack of reliability may require exclusion under Fed.R.Evid. 403 or constitutional due process).

stand, that she was able to say there was only one person in the car where Williams was murdered, notwithstanding its dark-tinted windows, because of her "special gift from God." Further, she picked them out from a photo array more than two months after the shooting, at a time when her memory was less than fresh.

On appeal, the defendants criticize this procedure on several grounds. First they object to the admission of Williams's statements on the basis of the hearsay from Schwartz, prior to receipt of the non-hearsay evidence of the murder. They also challenge the court's denial of their request to compel disclosure of the murder witnesses' names at the time of the initial hearing. This appears to be simply an aspect of their hearsay challenge: with the witnesses' names in hand, they wished to conduct independent investigations on their credibility and call either the witnesses or the defense investigators. To the extent that it was an independent discovery request, it was, as we discuss more fully below, clearly within the judge's discretion to deny it. See *United States v. Madeoy*, 652 F.Supp. 371, 375 (D.D.C.1987).

As we have said, the trial court quite explicitly made its waiver determination subject to later reconsideration, after it had the benefit of the murder witnesses' testimony at trial. See Tr. 10/15/93 at 566; Tr. 10/22/93 at 1466–67. In reality, then, the court's ultimate waiver determination was not based on hearsay. The defendants had the opportunity to examine the murder witnesses, and were in effect under an invitation to ask the court to reconsider its forfeiture decision. White and Hughes never did so. Even though the weaknesses in the testimony were enough to prevent the jury from reaching a verdict on the murder counts, neither the defendants nor the district court thought they were so serious as to call into question the court's prior evidentiary finding.

■ There is, in any event, no bar to partial reliance on hearsay for such preliminary decisions. Federal Rule of Evidence 104(a) says that the court, in making determinations on the admissibility of evidence "is not bound by the rules of evidence except those with respect to privileges." Because a judge, unlike a jury, can bring considerable experience and knowledge to bear on the issue of how much weight to give to the evidence, and because preliminary determinations must be made speedily, without unnecessary duplication of what is to occur at trial, it is within the judge's discretion to admit hearsay evidence that has at least some degree of reliability. See *Bourjaily*, 483 U.S. 171, 180, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987) (hearsay admissible to establish co-conspirator hearsay exception); *United States v. Matlock*, 415 U.S. 164, 173–76, 94 S.Ct. 988, 994, 995–96, 39 L.Ed.2d 242 (1974) (hearsay admissible at suppression hearing where consent to search at issue); 1 *Weinstein's Evidence* ¶ 104[02], at 104–28 to 104–31 (1996). We thus join all the other courts to have addressed the matter in approving at least partial reliance on hearsay. Of these courts, three have allowed hearsay declarations by potential witnesses of the defendants' threats against them, *Aguiar*, 975 F.2d at 47; *Balano*, 618 F.2d at 628; *Carlson*, 547 F.2d at 1353, and two have permitted hearsay declarations by a murdered potential witness, *Mastrangelo*, 693 F.2d at 273; *United States v. Houlihan*, 887 F.Supp. 352, 356–57 & n. 6 (D.Mass.1995). We leave for another day the issue of whether a forfeiture finding could rest *solely* on hearsay.

■ This takes us to defendants' central procedural objection, namely to the sequence of events at trial. They claim that Williams's statements should not have been admitted before the full exploration of the evidence of his murder. Here, as we understand it, defendants' objection is twofold. First, so far as the jury is concerned, because the jury was exposed to Williams's statements before the full non-hearsay trial of the murder, there was an undue risk of prejudice to the defendants. Second, and not completely independent, defendants at oral argument pressed the theory that once the trial judge contingently admitted Williams's statements on the basis of hearsay, momentum might have made it difficult for him to genuinely reevaluate the question once non-hearsay evidence came in.

Because of the trial judge's traditional discretion over such matters, defendants face an uphill fight. Again the cases on admission of co-conspirator hearsay supply us with guidance. Under the discretion embodied in Federal Rule of Evidence 104(c) to hear evidence on preliminary matters within or without the hearing of the jury, courts routinely admit hearsay statements of co-conspirators subject to connection through proof of a conspiracy. See *United States v. Perholtz*, 842 F.2d 343, 356 (D.C.Cir.1988); *United States v. Jackson*, 627 F.2d 1198, 1218 (D.C.Cir. 1980); 1 *Weinstein's Evidence* ¶ 104[05], at 104–62 to 104–74 (1996) (describing procedure followed in other circuits). If the connection is not proven, the court must either strike the testimony and instruct the jury to disregard it, or, if that is not enough protection, must grant a mistrial. *Jackson*, 627 F.2d at 1218. Although in *Jackson* we said that "the better practice" was to secure proof of the conspiracy adequate to sustain admission of the hearsay before the hearsay itself was received, we made clear that trial exigencies would often make that impracticable and endorsed the traditional "subject to connection" approach. *Id.* There was no greater danger here of prejudice to defendants—from admission of Williams's statements, which might ultimately have proven inadmissible for want of an adequate procurement showing—than in the co-conspirator hearsay context, and the procedure followed by the court was therefore adequate.

We note that here there happened to be a solution that might have been desirable—full trial of the murder issue before the jury, which would have concomitantly given the judge the evidence on the forfeiture issue, followed by admission of Williams's statements. The defendants never proposed this, however, and so the government had no chance to make any objections or the trial court to assess the possibility. Accordingly, we will not compare the merits of that approach with the procedure that was actually followed.

The alternative that the defendants in fact proposed was a preliminary hearing (with full presentation of the government's murder witnesses), outside the presence of the jury. This would take place after voir dire, by which time, according to the defendants, the identities of the witnesses would have been disclosed and therefore the security concerns would have been less pressing. See Tr. 10/15/93 at 559–60.

The claim that this procedure would have met the government's security concerns is ill-founded. First, it assumes that the murder witnesses' names would be disclosed at voir dire, which was not necessarily the case—and was not in fact the case. See Tr. 11/1/93 at 111–13. Further, identification of the murder witnesses at any time before their trial testimony would have altered defendants' incentives and thereby seriously increased the risks to the witnesses. Before a witness testifies to the jury, a defendant may avoid conviction if he or she is able to prevent the witness from appearing. Afterwards, all that witness elimination can achieve is retaliation and punishment—a lesson to others, to be sure, but scarcely of overwhelming value. Presumably, under the preliminary hearing arrangement proposed by defendants, the murder witnesses' testimony would have been admissible at the trial through Fed.R.Evid. 804(b)(1), which allows admission of prior testimony tested at that type of hearing. But testimony preserved in that fashion is of less value than live testimony, so that defendants would still have had a considerable incentive to dispose of the witnesses; the witnesses in turn, aware of the difference between testifying before and at trial, would have been open to threats and other tactics designed to obtain their silence. In fact, in this trial the eyewitnesses to the murder first testified only on November 22, 1993, two weeks after trial began, so that defendants' proposed preliminary hearing would have allowed defendants ample time to act. The course the court took—permitting the government to keep the identities of the murder witnesses secret until their trial testimony—was considerably less risky than defendants' proposal.

Further, defendants' suggested sequence would have been wasteful of judicial time, as the hearing and trial testimony on the murder would have been largely duplicative. The trial court was fully entitled to bear this

waste in mind. See *Jackson*, 627 F.2d at 1218.

We also cannot accept the claim made by defendants at oral argument that the trial judge, once he made a preliminary decision to admit Williams's statements, would have had such a psychological stake in his preliminary ruling that he would have been unable to carefully and faithfully assess the nonhearsay evidence. Defendants' thesis, if correct, would logically invalidate the standard "subject to connection" treatment of much evidence. The analogy is not exact, of course, as there the trial judge has not made a preliminary finding but has assumed that the foundation will eventually be laid. Here, reluctance to strike the evidence could arise not only from the frustration of seeing a lengthy trial go to waste but also—say defendants—from investment of judicial ego in the preliminary conclusion. But the risk that the latter increment would be material seems to fall somewhere between trivial and non-existent—particularly as the improved quality of the evidence would explain the judge's change of position. *Cf. Mahoney v. Babbitt*, 113 F.3d 219, 223 (D.C.Cir. 1997) (noting limited preclusive value of findings made in decisions granting or denying preliminary injunctions); *Commodity Futures Trading Comm'n v. Board of Trade*, 701 F.2d 653, 657–58 (7th Cir.1983) (same). Accordingly, we find no basis for regarding the trial judge's procedures here as an abuse of his discretion.

■ As a final matter, we turn to the question of whether the court committed clear error in finding that White and Hughes murdered Williams. There was ample evidence for the court to come to this conclusion. A bystander eye-witness made a photo array and an in-court identification of White as one of the two who shot Williams. Two others made an out-of-court photo identification of White and one eye-witness picked Hughes out of a photo array as the second gunman (although only based on having seen his side-profile). After the murder, a witness testified that he had overheard a conversation between White and Hughes in which one of them said "[We] killed the motherfucker,"

and another testified that White had told him "We took care of Chop [Williams]."

## B. Joint Trial (Hicks and Hutchinson)

Before and at different points during the trial, Hicks and Hutchinson separately moved for severance. The judge denied the motions and they now claim that doing so was an abuse of discretion. See *United States v. Tarantino*, 846 F.2d 1384, 1398 (D.C.Cir.1988).

The Supreme Court has found a general preference for joint trials in the federal system, based on the interests of efficiency and a reduced risk of inconsistent verdicts. *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 936, 122 L.Ed.2d 317 (1993). But the Rules provide for severance in order to prevent prejudice to a defendant. See Fed. R.Crim.P. 14. The most likely scenario for prejudice is where the fact of joint trial leads to the admission of evidence that tells against a defendant and would be inadmissible if he were tried alone. The risk is especially great if the admission is accompanied by a great disparity of evidence (i.e., the evidence shows that the defendant is far less culpable than his co-defendants) and the government's case is very complex. *Zafiro*, 506 U.S. at 539, 113 S.Ct. at 937. But the Court has noted that often less drastic measures than severance, such as limiting instructions, can adequately limit the risk of prejudice. *Id.* Here, Hicks relies mainly on the admission of hearsay against him, Hutchinson mainly on disparity of evidence. Neither convinces us that the district court abused its discretion.

■ Hicks points to the Williams hearsay, which was admissible only against White, Hughes and Ballard, the only defendants found to have been responsible for his murder. This, he says, impermissibly implicated him in the drug distribution and RICO conspiracies. But as we have said that admission alone does not compel a conclusion of prejudice. See *United States v. Potamitis*, 739 F.2d 784, 789–90 (2d Cir.1984); *United States v. Wood*, 879 F.2d 927, 937–38 (D.C.Cir.1989). Here, the independent evidence showing Hicks's role as a large-scale crack distributor was substantial and the court took reasonably effective steps to limit

the impact of Williams's hearsay to White and Hughes.

One important limiting measure was the court's direction to redact the Williams statements for any mention of Hicks, Hutchinson, the Crew or the First Street Crew. See Order (D.D.C. Oct. 26, 1993). The government, however, did not fully carry out this order. On two occasions there were concededly impermissible references to Hicks. The first time, Officer Abdalla, the police officer who debriefed Williams after the October 2, 1993 drug transaction involving White, testified on direct examination as follows:

> Q. And can you describe what it is that Arvell Williams told you occurred in that transaction on October 2, 1992?
>
> A. I met with Mr. Williams shortly after the purchase took place on October 2nd in the alley of the 1500 block of U Street. He advised me that they—himself and Officer Arrington—were in Officer Arrington's vehicle, and they drove into the area of First and V Streets and parked.
>
> Officer Arrington stayed in the vehicle. Arvell got out and walked into the 2000 block of First Street, where he saw a group of subjects standing, which he knew. *He said they were standing across from Eric's [Hicks's] house. He said that Danny [Hutchinson], Antone [White], Ronald [Hughes], Eric [Hicks], Dip—DIP [4]—and Cliff were standing there.*
>
> He said, he approached the group and yelled to Antone, let me holler at you. He said Antone then walked away from the group. He then advised Antone that he needed two-and-a-half, referring to two-and-a-half ounces.

Tr. 11/15/93 at 726–27 (emphasis added). After counsel objected, the judge issued corrective instructions, telling the jury that the references to Hicks and Hutchinson were improper, that it should disregard them, and that the witness "should not have said that." *Id.* at 738–39.

The second time, Officer Sutherland made the blunder:

> Q. What did you and him [Arvell Williams] talk about?
>
> A. We were attempting to arrange a purchase between Arvell, myself, and Derrick Ballard. . . . .
>
> Q. Now, looking at—on this date, October 6th, 1992, you spoke to Arvell Williams, you said, about this, correct?
>
> A. Yes, Sir.
>
> Q. What did he say to you, what did you say to him, if you recall?
>
> A. Okay. We discussed—*the actual intention of the deal originally was to do a transaction for three ounces with Eric Hicks.*

Tr. 11/16/93 at 812–13 (emphasis added). Again, the judge issued corrective instructions. *Id.* at 813.

The two improper references happened in the early days of a three-month trial, before the bulk of the evidence on Hicks's participation in the conspiracy and RICO enterprise came in. The government assured the court that such slips of the tongue would not occur again, and none did. In addition, the out-of-court statements were mostly offered as proof of the individual drug transactions set up by Williams rather than the general operation of the conspiracy and the RICO enterprise, so that the jury was likely able to compartmentalize the evidence. And at the conclusion of the trial the court emphatically instructed the jury to consider the Williams statements only against White and Hughes. Charge to the Jury at 5 (Jan. 28, 1994); see *United States v. Manner*, 887 F.2d 317, 325 (D.C.Cir.1989) (relying in part on instruction to jury in affirming denial of severance). These facts gave the court adequate grounds for finding that the hearsay's impact could be limited to Hughes and White.

Hicks moved for a mistrial following each of the improper references. The same reasons that justify the court's denial of severance—the strength of the independent case against Hicks and the compartmentalization of the hearsay (both in the way it was presented and the judge's limiting instructions)—also justify denial of the mistrial motions. See *United States v. Clarke*, 24 F.3d

---

**4.** Evidently the nickname of an unindicted person named Domani Colvin.

257, 270 (D.C.Cir.1994); see also *United States v. Eccleston*, 961 F.2d 955, 959–60 (D.C.Cir.1992) (stressing importance of strength or weakness of government's case in making mistrial determination); *Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 3109, n. 8, 97 L.Ed.2d 618 (1987) (noting presumption that jury will follow instructions).

■■■ Hutchinson's claim to a severance turns more on his comparatively modest role in the drug conspiracy and related acts of violence. Notwithstanding the fact that he was alleged to have been involved in fewer overt acts than, say, Hicks, the independent evidence against Hutchinson showed him on several occasions selling crack for the First Street Crew. See, e.g., Tr. 12/14/93 at 3284; Tr. 1/10/94 at 4565–66. On appeal he tries to pass the government's case off as an "exaggerated gloss on the circumstantial evidence at trial of Hutchinson's occasional presence among a group of friends," but the evidence was substantial and the disparity in roles not so great as to require a severance, even considering the one erroneous reference to him in Williams's hearsay.

C. Claims Based on Timing of Disclosure of Witnesses and Impeachment Material (Hughes)

■■■ Hughes claims that his right to present a defense was infringed by the denial of his motion for discovery of the government's witness list, or, as he styles it, the "anonymous witness procedure." Since he did not know whom the government was planning to call to testify, the argument goes, he was less able to cross-examine witnesses, develop inconsistencies in their testimony, and, further down the road, impeach them.

The constitutional right to cross examine has never been held to encompass a right to pretrial disclosure of prosecution witnesses. See *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977) (holding that *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), creates no government duty to disclose names of witnesses); *United States v. Bolden*, 514 F.2d 1301, 1312 (D.C.Cir.1975) (finding that in a non-capital case there is no

government duty to disclose its witness list); Fed.R.Crim.P. 16 (omitting names of witnesses from items subject to government disclosure). Compare 18 U.S.C. § 3432 (1994) (requiring advance notice of witnesses in a capital case). Whatever discretion we may assume the district court had to order advance disclosure of witnesses to satisfy particular defense needs, Hughes here offered no special reason in favor of disclosure, and security concerns for the witnesses plainly militated against it. See Memorandum and Order at 20–22 (D.D.C. Oct. 25, 1993); see also *United States v. Madeoy*, 652 F.Supp. 371, 375 (D.D.C.1987) (among factors to be considered in compelling discovery of government witness list are "[p]reparation for trial, effective cross-examination, expediency of trial, possible intimidation of witnesses, and the intrinsic reasonableness of the request").

■■■ Hughes also contends that he was deprived of his right to present a defense because the prosecution did not disclose material that would have enabled the defense to impeach three government witnesses. The prosecution's *Brady* duty to disclose evidence that is favorable to the defense and material clearly reaches items useful for impeachment. See *United States v. Dean*, 55 F.3d 640, 663 (D.C.Cir.1995). To show that evidence is material, the defense must establish that had it been produced, there is a reasonable probability that the outcome would have been different, or, if the evidence was produced late, there is a reasonable probability that earlier disclosure would have changed the outcome. *Id.*

■■■ One of the witnesses in question was a police officer who, according to an *ex parte* disclosure to the court, had been alleged by certain government informants to be possibly "hospitable to corruption." The informant did not claim to know of any actual effort to exploit the supposed hospitality, nor was the prosecutor aware of any effort. The officer's role was quite trivial: he was a chain-of-custody witness as to crack recovered in one of Hughes's drug transactions. An informant's derogatory speculation about a witness who played a minor role at trial hardly suggests the "reasonable probability" of a

different outcome that is needed for a *Brady* violation.

██ The two other government witnesses in question, Officers Ronald Bailey and John Harmon, were among the first police officers to arrive at the scene of the Williams shooting and testified about what they had seen and heard. In the middle of trial they were indicted for corruption. The prosecution immediately informed the judge, who told the jury and ordered the officers' testimony to be stricken from the record. Hughes speculates that the prosecution must have known beforehand that Officers Bailey and Harmon were suspected of corruption, and thus violated its *Brady* duty in failing to turn the information over earlier.

Under other circumstances the case might raise an interesting question about how broadly one defines "the prosecution" for purposes of the *Brady* duty to disclose; presumably someone in the U.S. Attorney's office knew of the evidence against the officers well before the assistant handling this case did. *Cf. United States v. Brooks,* 966 F.2d 1500 (D.C.Cir.1992) (discussing prosecutor's duty to search for Brady materials). Here, however, Hughes can show no prejudice. The most that earlier disclosure could have given him was the ability to neutralize the two witnesses on cross-examination. When the court told the jury of the indictments and said that the officers' testimony was being stricken, Hughes got exactly that; there is no suggestion that their testimony was unforgettably vivid or that a cross based on this alleged corruption would somehow have contaminated the government's whole case. If there was error, it was harmless. See *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967).

D. Limits on Cross–Examination (Hughes)

██ Appellant Hughes argues that the district judge improperly curtailed his cross-examination of three prosecution witnesses: Dequette Barr, a juvenile drug runner for the First Street Crew; Detective Angelo Parisi; and Sergeant Sutherland. Reviewing the district court's limits on cross-examination for abuse of discretion, see *United*

*States v. Thorne,* 997 F.2d 1504, 1513 (D.C.Cir.1993), we find none.

██ Seventeen years old at the time of trial, Dequette Barr gave damaging testimony against appellants. Among other things, Barr accused Hughes of threatening to kill him if he testified against Hughes. In a thorough cross-examination, Hughes's counsel established that Barr used and dealt drugs regularly, had three cars, earned around $5,000 a week from drug dealing, had recently been charged with the armed robbery of a family friend, and had agreed to plead guilty to a lesser robbery charge and to testify against appellants in exchange for the Government dismissing the armed robbery charge and a related firearm count. Hughes's co-counsel also established that Barr had lied to the judge in the armed robbery case, had lied to a probation officer during a presentence interview, and had been promised use immunity in exchange for his testimony about the First Street Crew's activities. Under these circumstances, the district court did not abuse its discretion in refusing to allow Hughes to cross-examine Barr on whether he had set his jail cell on fire. Even assuming such evidence was probative of Barr's truthfulness, as required by Fed. R. Evid. 608(b), it would have been cumulative. Nor did the court err in refusing to allow cross-examination regarding a prison grievance form stating in part that Barr was being denied "proper psychological" treatment. Joint Appendix ("J.A.") Vol. II at 721. Barr was not housed in the jail's psychiatric wing, and counsel presented no other evidence that Barr suffered from a mental illness. See *United States v. Smith,* 77 F.3d 511, 516 (D.C.Cir.1996) (evidence regarding mental illness relevant "only when it may *reasonably* cast doubt on the ability or willingness of a witness to tell the truth") (emphasis added).

██ The district court allowed Hughes's counsel, who was attempting to develop a theory that Hughes was not a member of the First Street Crew but of a different gang altogether, to question Detective Parisi at length about the fact that he first identified Hughes while monitoring Felman Hampton, the leader of another gang. Counsel also

secured the damaging admission from Parisi that he at one time thought Hughes and Hampton worked together selling drugs. Having afforded defense counsel ample leeway on cross-examination, allowing her to stray far beyond the scope of direct, Tr. 12/20/93 at 3847, the district court did not abuse its discretion in barring counsel from questioning Detective Parisi further.

■■■ With regard to Sergeant Sutherland, the court allowed counsel to cross-examine him on Williams's drug use, drug dealing, and prior convictions. Under cross-examination, Sutherland admitted that the police never tested Williams for drugs while Williams was working for them and that Sutherland did not know whether Williams was dealing drugs on the side. Hughes challenges the court's refusal to allow counsel to ask whether Williams had ever made false statements on an employment application and whether he had ever violated any court orders.

Although Fed. R. Evid. 806 provides that the credibility of a hearsay declarant "may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness," counsel attacked Williams's credibility using specific examples of misconduct, which, under Fed. R. Evid. 608(b), cannot be proved by extrinsic evidence. See *United States v. Morrison*, 98 F.3d 619, 628 (D.C.Cir.1996), *cert. denied*, —— U.S. ——–——, 117 S.Ct. 1279–80, 137 L.Ed.2d 355 (1997); *United States v. Brooke*, 4 F.3d 1480, 1484 (9th Cir.1993); *United States v. Lopez*, 944 F.2d 33, 38 (1st Cir.1991). Accordingly, Hughes's counsel could have asked Sergeant Sutherland only if Williams had ever lied on an employment form or violated any court orders, and could not have made reference to any extrinsic proof of those acts. See *Brooke*, 4 F.3d at 1484; *Lopez*, 944 F.2d at 38. Having known Williams for less than two months before his death, Sutherland may or may not have been able to answer those questions. In light of the damage already done to Williams's credibility through Sutherland's testimony about Williams's drug use, drug dealing, and prior convictions, the district court was within its

discretion to conclude that the questions were of little utility.

■■■ Hughes argues finally that the district court improperly cut off questions to Sutherland about the precautions the police took to protect Williams on the day of his murder. According to Hughes, this prevented counsel from developing her theory that Hughes was simply a scapegoat for police who had failed to protect an informant. But because Hughes was not convicted of the murder of Arvell Williams or of any counts related to the murder, any error in restricting cross on Hughes's thoroughly speculative theory was harmless.

E. Admission of Audiotapes (Hutchinson)

■■■ Claiming that the August 19 and 21 NAGRA tapes were not properly authenticated, appellant Hutchinson challenges their admission, as well as the jury's use of Government-prepared transcripts while listening to the tapes. He also challenges Sergeant Sutherland's identification of his voice, claiming that the identification rested at least in part on an un-Mirandized, post-arrest conversation. Admission of tape recordings falls within the "sound discretion" of the trial court. *United States v. Sandoval*, 709 F.2d 1553, 1554 (D.C.Cir.1983) (citing *United States v. Slade*, 627 F.2d 293, 301 (D.C.Cir. 1980)). Because Hutchinson failed to challenge Sutherland's voice identification in the district court, we review that claim for plain error only. See *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993).

To authenticate the tapes, the prosecution put on Officer Larry Sterling, who described the characteristics of a NAGRA recording device and identified the original tapes from the August 19 and 21 drug transactions. Sterling explained how he made copies of the originals and testified that the tapes were never reused. Sergeant Sutherland confirmed that the portions of the two conversations in which he participated were accurately recorded.

■■■ We have held that absent a showing of bad faith or evidence tampering, the Government need only "demonstrate that, 'as a

matter of reasonable probability,' possibilities of misidentification and adulteration have been eliminated." *United States v. Stewart,* 104 F.3d 1377, 1383 (D.C.Cir.1997) (quoting *United States v. Robinson,* 447 F.2d 1215, 1220 (D.C.Cir.1971) (en banc), *on rehearing,* 471 F.2d 1082 (1972), *rev'd on other grounds,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973)). Here, where one witness testified at length about the process of creating the tapes and identified the originals, and where another witness confirmed the accuracy of the portions of the tapes with which he was familiar, the Government met its burden. See *United States v. Strothers,* 77 F.3d 1389, 1392 (D.C.Cir.) ("Tapes may be authenticated 'by testimony describing the process or system that created the tape' or 'by testimony from parties to the conversation affirming that the tape[s] contained an accurate record of what was said.' ") (quoting *United States v. Dale,* 991 F.2d 819, 843 (D.C.Cir.1993)), *cert. denied,* —— U.S. ——, 117 S.Ct. 374, 136 L.Ed.2d 263 (1996); *cf. Sandoval,* 709 F.2d at 1555 (holding where tape corroborated by independent testimony of two police officers, and where defendant did not challenge accuracy of recording, court did not err in admitting tape despite prosecution's failure to authenticate it).

 Nor did the court abuse its discretion by allowing the Government to authenticate the tapes in the jury's presence, *cf. Slade,* 627 F.2d at 300 (decision to verify audibility of tapes in front of jury not an abuse of discretion), or by permitting the jury to use transcripts prepared by the prosecution. Hutchinson does not challenge the accuracy of the transcripts, see *id.* at 302, and the district court instructed the jurors that the transcripts were not evidence but merely intended to assist them in listening to the tapes. See *id.*; Tr. 11/9/93 at 278.

 Finally, the district court did not err, much less plainly err, when it allowed Sutherland to identify Hutchinson's voice based on a 45–minute post-arrest and concededly un-Mirandized conversation. Sutherland did not testify about the content of the conversation, and no Fifth Amendment right attaches to the sound of one's voice. See *United States v. Dionisio,* 410 U.S. 1, 7, 93 S.Ct. 764, 768, 35 L.Ed.2d 67 (1973) (Fifth Amendment privilege does not prohibit compelling voice exemplars); *United States v. Thomas,* 586 F.2d 123, 133 (9th Cir.1978) (agent's identification of defendant based on sound of voice, not content of prior conversation, did not violate Fifth Amendment); *United States v. Ryan,* 478 F.2d 1008, 1012–13 (5th Cir.1973) (agent's identification of defendant's voice based on non-Mirandized conversation did not violate Fifth Amendment); *cf.* Fed. R. Evid. 901(b)(5) (providing that witness may identify a voice to determine admissibility of recorded conversations if witness has heard the voice "*at any time* under circumstances connecting it with the alleged speaker") (emphasis added).

F. Testimony of Detective Rawls

 Appellants jointly argue that the district court erred in allowing Detective Dwight Rawls to testify as an expert in the narcotics trade, claiming that his testimony violated Fed. R. Evid. 704(b) because he testified about the mental state of the defendants, and Fed. R. Evid. 702 because he gave his opinion on the ultimate issues of defendants' participation in an illegal conspiracy and in a continuing criminal enterprise. Because appellants failed to object to the portions of Rawls's testimony they now challenge, we again review for plain error only. See *Olano,* 507 U.S. at 732, 113 S.Ct. at 1776.

As we read the record, the prosecutor took great care to avoid eliciting improper testimony from Rawls. After first asking Rawls about the origin and makeup of crack cocaine and its packaging for distribution, the prosecutor posed a series of questions about the District's cocaine distribution network, all couched in the first person: "Detective Rawls, if I wanted to become—to start selling crack cocaine in Washington, could I walk up to somebody I thought was selling on the street and just ask them for a large amount of crack cocaine?" Tr. 1/14/94 at 5146. "If I'm starting off in the cocaine business, are there any tools of the trade or pieces of equipment I should pick up?" *Id.* at 5148. "What kinds of things would I want people to do for me rather than do myself in the drug business if I was working my way

up?" *Id.* at 5151. "How do I go about selecting a stash house ... ?" *Id.* at 5156.

Notably absent from both the prosecutor's questions and Rawls's answers were the "mirroring hypotheticals" that have concerned us in other cases. In one case, for example, the prosecutor posited a "hypothetical" person with "25.5 grams [of a substance] that turns out to be cocaine base ... a pager, $580 in small denomination bills, 56 empty ziploc bags, and a 9 millimeter handgun," asking an expert witness what activity possession of those items suggested. *United States v. Smart,* 98 F.3d 1379, 1385 (D.C.Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1271, 137 L.Ed.2d 349 (1997). In another, *United States v. Mitchell,* 996 F.2d 419, 422 (D.C.Cir.1993), the prosecution presented an expert witness with a hypothetical person carrying nine ziploc bags of crack cocaine, asking what the intent of the person carrying the ziplocs was. The expert witness responded, "It was intent to distribute." And in a third case, an expert witness, asked by the prosecutor to describe the intentions of a person possessing a number of ziploc bags, responded that the bags "were meant to be distributed." *United States v. Williams,* 980 F.2d 1463, 1465 (D.C.Cir.1992). In each of these cases, we concluded that admission of the expert's testimony violated Rule 704(b), but nevertheless affirmed, either because the error was harmless or because the district judge intervened to cure the error. *Smart,* 98 F.3d at 1391 (harmless error, in light of overwhelming evidence); *Mitchell,* 996 F.2d at 423 (no plain error, because no settled circuit law on mirroring hypotheticals prior to defendant's trial); *Williams,* 980 F.2d at 1466 & n. 1 (judge's comment that expert witness "ha[d] no knowledge" about defendant's intentions sufficient to cure error; in alternative, error harmless).

In this case, the only mirroring hypotheticals came from defense counsel. See Tr. 1/14/94 at 5211. The prosecutor properly confined his questions to elicit "expert testimony concerning the *modus operandi* of individuals involved in drug trafficking," which, as we have repeatedly held, does not violate the rules of evidence governing expert testimony. *United States v. Boyd,* 55 F.3d 667, 671 (D.C.Cir.1995) (no violation of Rule 704(b) when expert testifies as to *modus operandi* of drug dealers, including drug packaging and roles that individuals play in drug distribution network); *United States v. Boney,* 977 F.2d 624, 628 (D.C.Cir.1992) ("The operations of narcotics dealers repeatedly have been found to be a suitable topic for expert testimony because they are not within the common knowledge of the average juror."); *cf. United States v. Clarke,* 24 F.3d 257, 268 (D.C.Cir.1994). The prosecutor's examination of Detective Rawls was a textbook direct examination of a drug expert.

 Appellants' argument that Rawls's testimony violated Rule 702 is equally unpersuasive. Despite the district judge's express admonition before Rawls took the stand that counsel should object if they thought any testimony or question improper, see Tr. 1/14/94 at 5133, appellants failed to object at any time to the statements they now claim warrant reversal. Indeed, nearly all of appellants' examples of objectionable testimony occurred on cross-examination. The testimony appellants highlight as "particularly pernicious," Rawls's statement that groups working together to screen and refer customers were "definitely a part of the same enterprise," came in response to this question on cross-examination: "That is, the people that were selling in the same area do [sic] regard themselves as part of the same enterprise. Is that what you're saying?" Tr. 1/14/94 at 5173–74. We will not allow appellants to use Rawls's response—"No. They're definitely a part of the same enterprise"—to argue that his testimony impermissibly established the "enterprise" element of a "continuing criminal enterprise," when appellants put the words in his mouth to begin with.

## G. Proof of Age (Hughes)

 Hughes was born on October 3, 1973. To convict him of a section 846 drug conspiracy, the Government had to prove that he ratified his participation in the conspiracy at some point after his eighteenth birthday in October 1991. *United States v. Welch,* 15 F.3d 1202, 1209 (1st Cir.1993); *United States v. Maddox,* 944 F.2d 1223, 1233 (6th Cir.1991). In his motion for judg-

ment of acquittal on the drug conspiracy count, Hughes argued that the Government failed to prove his age and had therefore failed to provide the jury with evidence from which it could conclude that Hughes ratified his participation in the conspiracy after he turned eighteen. In response the prosecution pointed to two heatseals, Exhibits 132–B and 133–B, with Hughes's date of birth written at the top. Heatseals are plastic evidence envelopes containing, in this case, drugs seized during the arrest, sealed across the top with a hot press to prevent tampering. Claiming that they contained hearsay, Hughes objected to the use of the heatseals. The court overruled his objection, denying his motion for judgment of acquittal. Later, in response to a note from the jury requesting defendants' birth dates, and over Hughes's objection, the court directed the jury to look at Exhibits 132–B and 133–B.

▆▆▆ Hughes claims the judge committed reversible error when he denied his motion for judgment of acquittal. Hughes first raised a hearsay objection to Exhibits 132–B and 133–B on January 24. But nearly three weeks earlier, during direct examination of Officer Larry Hale, the Government introduced Exhibit 132–B and the court accepted it into evidence. No one objected. Tr. 1/5/94 at 4376. Hughes's hearsay challenge to Exhibit 132–B thus "comes too late." *Salzman v. United States*, 405 F.2d 358, 361 (D.C.Cir.1968). See also *United States v. Hernandez*, 780 F.2d 113, 117 n. 4 (D.C.Cir. 1986) (hearsay statement, unobjected-to at trial, "properly admitted and given its full probative value"); *United States v. Sampol*, 636 F.2d 621, 683 (D.C.Cir.1980) (having failed to object to certain testimony at trial, appellants were "not in a position to complain that the admission of the ... testimony was error").

Because Hughes failed to object to Exhibit 132–B, our review is again for plain error only. See *United States v. Washington*, 12 F.3d 1128, 1138 (D.C.Cir.1994). Hughes does not challenge the accuracy of the birth date on the heat seals. In fact, in an earlier filing in the district court and again at oral argument, counsel admitted that Hughes was

born on October 3, 1973. Mem. of Points and Authorities In Support of Mot. To Dismiss Indictment (Sept. 7, 1993) at 2. Because Exhibit 132–B provides sufficient basis for the jury to determine Hughes's birth date, and thus that Hughes ratified his participation in the drug conspiracy after he became an adult, his conspiracy conviction stands.

## H. Enterprise Element of RICO Conspiracy (White)

White argues that there was insufficient evidence that the conspiracy had the requisite degree of structure apart from its pattern of substantive offenses and that the district court incorrectly charged the jury on the enterprise element of the First Street Crew's Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy.[5] We conclude that considerable evidence indicates the conspiracy possessed a structure that extended beyond the substantive offenses and that the instructions thoroughly and accurately described the enterprise element, keeping it distinct from the pattern of racketeering activity.

### 1. Standard of Review and Applicable Law

▆▆▆ As to the sufficiency of the evidence, Hughes's counsel argued that "there has been no identifiable structure to this group proven by the government." Tr. 1/21/94 at 5272–73. In support of White's motion for judgment of acquittal, his counsel "adopt[ed] and join[ed] in all of the arguments that have been made by other counsel." *Id.* at 5311. The point thereby having been preserved for appeal, we affirm the jury's finding of guilt if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979). The only defense objection in the record covering the district court's instructions on the enterprise element is Hughes's counsel's objection "to

---

**5.** Hicks adopts White's argument regarding "the existence of a RICO enterprise." Hicks Br. 19.

all instructions which are different than those proposed by the defendants." Tr. 1/25/94 at 5584. We are not convinced that this generic objection adequately apprised the district court of any particular assignment of error. See *United States v. Sayan,* 968 F.2d 55, 59–60 (D.C.Cir.1992) (failure to object to instruction on ground asserted on appeal results in plain error review); see also *United States v. Purvis,* 21 F.3d 1128, 1130 (D.C.Cir.1994) (general objection to variance from form instruction preserves point if, "in light of the surrounding circumstances, [it is] sufficient to provide the district court with some indicia of the potential defects in the instruction"). Nevertheless, we assume *arguendo* that the objection adequately preserved all relevant objections. Accordingly, we review *de novo* whether the instructions properly conveyed the enterprise element of the RICO conspiracy to the jury. *United States v. Fennell,* 53 F.3d 1296, 1301 (D.C.Cir.1995). We defer to the district court's choice of language unless it constituted an abuse of discretion. *Joy v. Bell Helicopter Textron,* 999 F.2d 549, 556 (D.C.Cir.1993).

■ "Evidence of an ongoing organization, formal or informal" and "evidence that the various associates function as a continuing unit" are essential to establish the enterprise element of a RICO conspiracy. *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981); see also *United States v. Perholtz,* 842 F.2d 343, 362 (D.C.Cir.) (enterprise established by proof of "(1) a common purpose among the participants, (2) organization, and (3) continuity"), *cert. denied,* 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988). While the enterprise "is an entity separate and apart from the pattern of activity in which [the enterprise] engages" and "at all times remains a separate element which must be proved by the Government," *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528, "the existence of the enterprise may be inferred from proof of the pattern," *Perholtz,* 842 F.2d at 362.

### 2. Sufficiency of the Evidence

White argues that the government failed to produce sufficient evidence that the First Street Crew had the degree of organization required to constitute an enterprise. In his view, the government did not prove that the conspiracy possessed "an organizational pattern or system of authority." *United States v. Tillett,* 763 F.2d 628, 632 (4th Cir.1985) (citing *United States v. Lemm,* 680 F.2d 1193 (8th Cir.1982), *cert. denied* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983)). Instead, he argues that the government proved only the predicate acts, without establishing the existence of a separate organization.

Specifically, White contends that the evidence established only that White and Hicks supplied drugs to others, who then acted as independent drug sellers and retained their own profits. He adds that there was no proof of a hierarchy or decision-making process within the conspiracy and asserts that the government's evidence at best "proved a loosely knit association of neighborhood drug dealers." White's Br. at 15. In his reply brief, he observes that one of the government's witnesses stated that White and Hicks personally participated in preparing cocaine for sale—in his view contradicting their allegedly supervisory status.

■ In response, the government points to a wide range of evidence about the organization of the First Street Crew and its operations. Among other things, the conspiracy gave itself a name, Tr. 1/10/94 at 4580, protected a geographic marketing area, *id.* at 4581, and ran centralized crack storage and preparation operations (for example, at Hicks's house, *id.* at 4580).[6] In addition, the evidence demonstrated that White and Hicks occupied positions superior to the conspiracy's retail-level drug sellers. After 1990, White participated directly in large sales only. *Id.* at 4585. White and Hicks used others to sell to buyers they did not know, *id.* at 4573, and supplied crack to middle-men, who resold it at the retail level, Tr. 12/15/93 at 3437; Tr. 12/16/93 at 3621–22, 3629; Tr. 1/12/93 at 4902–05. White and Hicks issued

**6.** While many (but not all) of the indicia of the First Street Crew's organization are also part of its pattern of racketeering activity, evidence of a pattern of racketeering activity can establish the existence of an enterprise as well. See *Perholtz,* 842 F.2d at 343.

instructions to other members of the conspiracy. Tr. 11/17/93 at 1060–61, 1122. White and Hicks shared their income and cocaine supplies, Tr. 12/16/93 at 3623; Tr. 1/10/94 at 4587–88, and Hicks substituted for White in the Crew's leadership when White was incarcerated, Tr. 1/10/94 at 4589–90. As to White's contention that if he and Hicks truly were supervisors they would not have prepared cocaine for sale themselves, the fact that supervisors may assist in an organization's substantive work when the need arises does not negate their supervisory role. Accordingly, the evidence of the conspiracy's structure and hierarchy more than adequately established the organization prong of the enterprise element of a RICO conspiracy.

### 3. Instructions

■ White argues that the district court's RICO conspiracy instructions were flawed in that they did not make clear that the enterprise must exist separate and apart from the predicate acts. Although the instructions do not expressly state that the enterprise is separate from the pattern of racketeering activity, they emphasize that an enterprise is an essential element of a RICO conspiracy. Tr. 1/28/94 at 48–49. They make clear, in language similar to that set out in *Turkette* and *Perholtz*, that the existence of an enterprise "may be established by evidence showing an ongoing organization, formal or informal, and by evidence that the individuals making up the association functioned as a continuing unit." *Id.* at 49. And they discuss the enterprise element of a RICO conspiracy separately from the pattern of racketeering activity element.[7] The instructions thus give "proper attention ... to the organization and continuity requirements for the enterprise, on the one hand, and the 'continuity plus relationship' requirement for the pattern of racketeering, on the other hand." *Perholtz,* 842 F.2d at 363. Accordingly, we conclude that the district court's RICO conspiracy instructions adequately informed the jury of the enterprise element.

### I. RICO Conspiracy in Interstate Commerce (White and Hicks)

White and Hicks argue that there was insufficient evidence that the First Street Crew's RICO conspiracy was engaged in or substantially affected interstate commerce and that the district court's instructions on the interstate commerce element of the conspiracy were incorrect.[8] They base their arguments principally on *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), in which the Supreme Court struck down the Gun–Free School Zones Act of 1990 on the ground that it did not have a constitutionally sufficient connection to interstate commerce. Under our

---

7. As to the enterprise element, the district court instructed the jury as follows:

 As used in these instructions, the term enterprise includes a group of persons associated in fact, even though their association is not recognized as a legal entity, corporation or partnership. The group or association of persons can be an enterprise if these individuals have joined together for the purpose of engaging in a common course of conduct over a period of time. Such an association of persons may be established by evidence showing an ongoing organization, formal or informal, and by evidence that the individuals making up the association functioned as a continuing unit. Such an association of individuals may retain its status as an enterprise even though the membership of the association changed by the addition or loss of individuals during the course of its existence.

 Tr. 1/28/94 at 48–49. The court instructed on the pattern of racketeering activity as follows:

 The RICO statute goes on to require proof by the government of a pattern of racketeering activity. In order to establish a pattern of racketeering activity as alleged in the RICO counts of

the indictment, the government must prove beyond a reasonable doubt, one, that at least two acts of racketeering as detailed in count five of the indictment were committed within ten years of each other after October 15, 1970. The government must prove beyond a reasonable doubt every element of the offense that constitutes the racketeering act. Two, that the racketeering acts had the same or similar purposes, results, participants, victims or methods of commission or were otherwise interrelated by distinguishing characteristics and were not isolated events. Three, that the racketeering acts constitute a threat of continued activity. This may be established when the evidence shows that the racketeering acts were part of a long-term association that existed for criminal purposes.

 *Id.* at 50–51.

8. The district court instructed the jury with regard to the RICO conspiracy that "[t]he evidence need not show any particular degree of effect on interstate commerce." Tr. 1/28/94 at 50.

post-*Lopez* decision in *United States v. Edwards,* 98 F.3d 1364 (D.C.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1437, 137 L.Ed.2d 544 (1997), however, their interstate commerce argument fails.

In *Edwards,* we held that the Comprehensive Drug Abuse Prevention and Control Act of 1970 (Drug Act) regulates activities that substantially affect interstate commerce and thus that the Drug Act is within Congress's commerce clause power. See *Edwards,* 98 F.3d at 1369; see also *United States v. Leshuk,* 65 F.3d 1105, 1112 (4th Cir.1995) (concluding intrastate activities regulated by Drug Act "are clearly tied to interstate commerce"). If the underlying activity (*e.g.,* drug dealing) substantially affects interstate commerce, conspiracies engaging in that activity also substantially affect interstate commerce. See *United States v. Conn,* 769 F.2d 420, 424 (7th Cir.1985). Accordingly, the voluminous evidence of the underlying drug offenses also serves as evidence of the conspiracy's substantial effect on interstate commerce. Moreover, the fact that the district court did not require the jury to find that the conspiracy in this case affected interstate commerce to any particular degree is irrelevant. See *Lopez,* 514 U.S. at 558, 115 S.Ct. at 1629 (" '[W]here a *general regulatory statute bears a substantial relation to commerce,* the *de minimis* character of individual instances arising under the statute is of no consequence.' ") (emphasis in original) (quoting *Maryland v. Wirtz,* 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 2024, n. 27, 20 L.Ed.2d 1020 (1968), *overruled on other grounds, National League of Cities v. Usery,* 426 U.S. 833, 840, 96 S.Ct. 2465, 2468, 49 L.Ed.2d 245 (1976)).

## J. Instructions on Drug Conspiracy

The appellants argue jointly that the district court's instructions on their multiple conspiracy theory, on the knowledge element of the drug conspiracy and on their buyer-seller relationship theory were erroneous.[9] We conclude that the court conveyed the

essential information regarding the appellants' multiple conspiracy theory, their argument about the knowledge element is based on a misreading of the pertinent instruction and the buyer-seller relationship instruction was accurate.

### 1. Standard of Review

While two of the appellants' lawyers objected at trial to the district court's instruction on the buyer-seller relationship, Tr. 1/25/94 at 5572, 5596, there were no specific objections to the instructions on the multiple conspiracy theory and the knowledge element. One defense counsel, however, objected to all instructions that differed from the defense's proposed instructions, *id.* at 5584, and we will assume *arguendo* that the three issues were preserved for appeal.[10] We therefore review *de novo* whether the district court's instructions properly conveyed the elements of the drug conspiracy to the jury. *United States v. Fennell,* 53 F.3d 1296, 1301 (D.C.Cir.1995). We defer, however, to the district court's choice of language unless that language constituted an abuse of discretion. *Joy v. Bell Helicopter Textron,* 999 F.2d 549, 556 (D.C.Cir.1993).

### 2. Multiple Conspiracies

The appellants argue that the district court inadequately charged the jury on the difference between a single conspiracy (as the government alleged) and multiple conspiracies (as they claimed). Specifically, they contend that the instruction did not require the jury to acquit if it found separate conspiracies and did not explain how to distinguish a single conspiracy from multiple conspiracies.

The district court instructed the jury that the separate drug sales did not amount to a single conspiracy under White's defense theory, Tr. 1/28/94 at 23, that "proof of several separate conspiracies would not be proof of the single, overall conspiracy charged in the indictment," *id.* at 45, and that, to convict, each defendant must have joined in the main conspiracy, *id.* at 42, and the conspirators

---

9. Hutchinson separately briefed the same issues, adding only the uncontested and irrelevant point that some of the evidence supported the defense's multiple conspiracy and buyer-seller theories.

10. See *supra* section III.H.1.

had to have entered into a common undertaking, *id.* at 43. The appellants rely exclusively on *United States v. Tarantino*, 846 F.2d 1384 (D.C.Cir.), *cert. denied*, 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988), to challenge those instructions. But the only relevant charge given in *Tarantino* and omitted here was the express instruction to acquit if there was no single conspiracy as charged and the statement that "[i]f you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit the defendant." *Id.* at 1400.

▇▇▇▇ As to the first point, in addition to instructing the jury that proof of multiple conspiracies is not proof of the single conspiracy as charged, the court explained the government's burden of proving beyond a reasonable doubt "the elements of each of these offenses." Tr. 1/28/93 at 26. The court was not required to additionally remind the jury, as it discussed each offense, to acquit the defendant if that offense was not proved. On the second point, the court's instructions that, to convict, the defendants had to have entered into a common undertaking and could not instead have been members of separate conspiracies adequately conveyed the notion that a defendant who is a member of a conspiracy other than the single, charged conspiracy must be acquitted. Accordingly, the instructions on the multiple conspiracy theory were adequate.

### 3. Knowledge Element

The appellants next argue that the district court improperly instructed the jury that a defendant need not have been aware of the conspiracy's common purpose or have known that the conspiracy existed. The appellants misread the pertinent instruction.

▇▇▇ To support a conspiracy conviction, a defendant must have knowingly participated in the conspiracy. *United States v. Wynn*, 61 F.3d 921, 929 (D.C.Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 578, 133 L.Ed.2d 501 (1995); see also *United States v. Childress*, 58 F.3d 693, 707 (D.C.Cir.1995) (conspiracy is specific intent crime requiring knowing participation), *cert. denied,* — U.S. ——, 116 S.Ct. 825, 133 L.Ed.2d 768 (1996). Accord-

ingly, the district court instructed the jury that, to convict, it had to find that "the defendant knowingly and willfully joined and participated in the conspiracy with the specific intent to distribute crack or to possess it with intent to distribute it." Tr. 1/28/94 at 42. The appellants do not contest the accuracy and adequacy of that instruction but contend that the following charge undermined it:

> It is not necessary that the government prove that a particular defendant was aware of the common purpose, had knowledge that the conspiracy existed, and was a member of the conspiracy from the beginning. Different persons may become members of the conspiracy at different times.

*Id.* at 44. In the appellants' view, the above instruction allowed the jury to convict a defendant who had no awareness of the conspiracy's common purpose and no knowledge of the conspiracy's existence. The disputed charge, however, occurred in the middle of a series of instructions spelling out in more detail, but not superseding or eliminating, the earlier, more general instructions regarding the elements of a conspiracy. Viewed in the context of the entire charge, therefore, we conclude that the more natural reading of the sentence is that the phrase, "from the beginning," modifies all three of the preceding clauses. In other words, the instruction explained that a defendant need not have been aware of the conspiracy's common purpose "from the beginning," have known of the conspiracy's existence "from the beginning" or have been a member of the conspiracy "from the beginning." The court's phraseology thus was plainly within its discretion. See *Joy*, 999 F.2d at 556 (district court's choice of language in instructions reviewed for abuse of discretion).

### 4. Buyer–Seller Transaction

Finally, the appellants argue that the district court's instruction on their buyer-seller defense theory was not balanced. Specifically, they complain that, although the court provided an accurate explanation of the theory, it did not summarize the evidence supporting the theory and added an explanation

that other evidence may combine with a buyer-seller relationship to establish a conspiracy.

■ After instructing the jury that "[a] simple buyer-seller relationship alone does not make out a conspiracy," the court explained the circumstances in which such a relationship may combine with other evidence to prove the existence of a conspiracy.[11] Tr. 1/28/94 at 43. The appellants characterize the latter portion of the instruction as "summariz[ing] the facts relied upon by the government but not those advanced by the defense." Appellants' Joint Br. 78. Relying on *United States v. Conlon*, 661 F.2d 235, 237 (D.C.Cir.1981) (refusal to give defense theory instruction not error if court does not recite facts supporting government's theory), *cert. denied*, 454 U.S. 1149, 102 S.Ct. 1015, 71 L.Ed.2d 304 (1982), they contend that the instruction was impermissibly imbalanced. Some of the factors—such as multiple sales and sales on credit—the district court identified as examples of factors that can combine with a buyer-seller relationship to prove the existence of a conspiracy did overlap with the facts of this case. Nevertheless, the examples the district court used accurately illustrated the legal point and did not rise to a "review by the Trial Court of the facts relied upon by the government." *Id.* We therefore reject this assignment of error.

11. The government concedes that a buyer-seller relationship does not constitute a conspiracy, Gov't Br. 170; see also *United States v. Morris*, 836 F.2d 1371, 1374 (D.C.Cir.1988), and the appellants do not dispute that such a relationship may combine with other evidence to prove knowing participation in a conspiracy, see *United States v. Baylor*, 97 F.3d 542, 547 (D.C.Cir.1996). The parties thus agree on the applicable law and dispute only the phrasing and balance of the instruction.

12. The appellants also argue more directly that the alleged contact and statements deprived them of their right to an impartial jury. Appellants' Joint Br. 52–57. As they recognize, however, the principal question before us is whether a hearing was required; the hearing, if necessary, would decide the effect of any misconduct on the trial. Appellants' Joint Br. 55 (acknowledging that trial court assesses potential juror bias); see also *United States v. Williams*, 822 F.2d 1174, 1189 (D.C.Cir.1987) ("The trial court

## III

### A. Juror Misconduct

The appellants argue that the district court should have conducted a hearing to determine whether juror misconduct interfered with their right to be tried by an impartial jury. Specifically, they contend that the court should have investigated whether they were prejudiced by juror no. 10's alleged contact with a government witness's sister, prejudicial statements during deliberations and dishonesty during *voir dire*.[12] The district court, however, made a well-supported finding that the alleged misconduct had not occurred and therefore it was not required to conduct a hearing on the question of prejudice.

### 1. Standard of Review

■ We review the district court's choice of procedures to investigate the alleged juror misconduct for abuse of discretion.[13] *United States v. Williams–Davis*, 90 F.3d 490, 497 (D.C.Cir.1996), *cert. denied*, —— U.S. —— & ——, 117 S.Ct. 986 & 988, 136 L.Ed.2d 867, 869 (1997). The district court's factual determinations regarding the alleged misconduct are "entitled to great weight, and [in the absence of new facts] ought not to be disturbed unless ... 'manifestly unreasonable.'" *Hobson v. Wilson*, 737 F.2d 1, 49 (D.C.Cir.1984), *cert. denied*,

obviously is the tribunal best qualified to weigh the relevant factors [regarding juror misconduct] and draw the conclusion appropriate [sic]."). We can examine (and have done so) the effect of a juror's failure to answer a question honestly during *voir dire*. See, e.g., *United States v. Williams–Davis*, 90 F.3d 490, 503–04 (D.C.Cir. 1996), *cert. denied*, —— U.S. ——, ——, 117 S.Ct. 986 & 988, 136 L.Ed.2d 867, 869 (1997). But the appellants do not ask us to do so in this case. Appellants' Joint Br. 59 (arguing only for district court hearing on *voir dire* issue).

13. Although the defendants' new trial motion did not address the conduct of juror no. 10 during *voir dire*, the motion asked generally for a hearing to investigate juror misconduct. J.A. Vol. II at 556. In addition, their reply to the government's opposition to the motion raised the *voir dire* issue and asked for a hearing on that ground, among others. *Id.* at 613–14. The point thus was preserved for appeal.

470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); see also *Leisher v. Conrad*, 41 F.3d 753, 756 (D.C.Cir.1994).

### 2. Background

During the initial screening of the jury using a written questionnaire, the district court asked potential jurors whether they or their close friends or relatives lived, worked or frequently spent time near the intersection of First Street and Rhode Island Avenue, NW—the area of the appellants' drug sales. The court asked a similar question during *voir dire*, as well as whether the potential jurors knew any of the parties or the potential witnesses. Juror no. 10 apparently answered "no" to those questions.

■■■ After the trial ended, the appellants obtained an affidavit from the jury forewoman asserting that juror no. 10 stated during deliberations that she had recently spoken with the sister of a government witness, Michael Jackson (Jackson), and the sister had told her that White and his group were responsible for the death of another government witness, Doris J. or Johnson (Doris). J.A. Vol. II at 558 bis. The appellants moved for a new trial and requested a hearing to investigate the alleged misconduct. *Id.* at 553–57. In opposing the new trial motion, the government submitted affidavits from: (1) Jackson's four sisters, denying that they knew any jurors in the case, *id.* at 578–85; (2) the forewoman, explaining that juror no. 10 did not claim she learned of Doris's death from Jackson's sister, that juror no. 10's statements occurred after the jury had returned the last of the convictions upon which it agreed and that the statements came while the jury was "screaming and hollering" and thus may not have been heard by the other jurors, *id.* at 598–601; and (3) juror no. 10, denying that she knew any of the witnesses or their family members, including Jackson and his sisters, that she knew of the deaths of any potential witnesses or that she made any of the statements attributed to her by the forewoman, *id.* at 602–

05. The appellants declined a subsequent opportunity to interview juror no. 10 under terms imposed by the court. The court denied the new trial motion without a hearing.

### 3. Decision Not to Conduct Hearing

■■■ If an improper private communication with a juror has occurred, a hearing ordinarily is required to determine whether the communication resulted in prejudice.[14] See *Remmer v. United States*, 347 U.S. 227, 229–30, 74 S.Ct. 450, 451–52, 98 L.Ed. 654 (1954); *Leisher*, 41 F.3d at 757 ("[W]here a proper request [for a hearing] is made, questioning of the jury foreman alone will likely not be sufficient to ensure that any prejudice has been dispelled."); *United States v. Butler*, 822 F.2d 1191, 1196 (D.C.Cir.1987) ("[T]he proper procedure for the judge confronted with an allegedly improper juror contact is to hold a hearing 'to determine the effect of such occurrences when they happen.'"). The same is true when a juror is shown to have lied during *voir dire*. See *United States v. Boney*, 977 F.2d 624, 634 (D.C.Cir.1992). Nevertheless, a hearing was not required in this case.

The issue here is not whether improper contact or a lie during *voir dire* resulted in prejudice but whether such a contact or lie occurred at all. A hearing is not always required to determine the factual underpinning of a juror misconduct claim, as opposed to the prejudicial effect of uncontested misconduct.

■■■ Instead, the court has broad discretion in deciding how to investigate such a claim. Among the factors it should consider are the strength and seriousness of the allegations. See *United States v. Caldwell*, 776 F.2d 989, 998–99 (11th Cir.1985). Here, the allegation of an improper communication was countered by substantial evidence that no such communication had occurred; the court was not required to pursue the matter any further by holding a hearing. It found, based on the affidavits before it, that no conversation with any of the Jackson sisters

---

14. The factors to be considered in determining prejudice include the nature and length of the improper contact, the possibility of removing the taint with a limiting instruction and the impact both on the juror in question and on the jury. *Williams*, 822 F.2d at 1188–89; see also *Leisher*, 41 F.3d at 756.

had occurred and we defer to that finding. See *Hobson*, 737 F.2d at 49.

■ As to juror no. 10's alleged lie during *voir dire*, the appellants fail to identify any question that juror no. 10 answered dishonestly even assuming that she knew one of Jackson's sisters. The best appellants can do is point to the questions regarding whether the jurors, their close friends or relatives frequented the First Street and Rhode Island Avenue area and whether the jurors knew any of the parties or potential witnesses. Neither of the questions called for juror no. 10 to reveal that she was acquainted with one of Jackson's sisters (again assuming she was so acquainted). With no evidence of dishonesty, there was no need for the district court to examine the issue further. See *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 849, 78 L.Ed.2d 663 (1984) (showing of dishonesty necessary precursor to investigation of prejudice); *United States v. North*, 910 F.2d 843, 904 (D.C.Cir.1990) (same), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).

Moreover, the defendants' decision not to take advantage of the opportunity to talk to juror no. 10 undermines their demand for a hearing. Although the defendants argue that the court was obliged to hold a hearing to get to the bottom of the matter, they themselves were not willing to take the easiest step toward determining whether juror no. 10 had improper contacts with one of Jackson's sisters. As to the terms imposed by the court,[15] the defendants could have proceeded with the interview and preserved their objections for appeal.

**B. Sentencing Issues (White)**

■ White argues that the district court erred in sentencing him on both his drug conspiracy conviction (21 U.S.C. § 846) and his RICO conspiracy conviction (18 U.S.C. 1962(d)).[16] He contends that the drug conspiracy is a lesser included offense of the RICO conspiracy and the district court therefore was barred from imposing cumulative sentences for the two offenses.[17] Although we agree that the drug conspiracy is a lesser included offense of the RICO conspiracy, cumulative punishments nevertheless are permissible because the Congress so intended.

**1. Standard of Review**

As White and the government agree, this question is one of law that we review *de novo*. See *United States v. Doe*, 934 F.2d 353, 356 (D.C.Cir.), *cert. denied*, 502 U.S. 896, 112 S.Ct. 268, 116 L.Ed.2d 221 (1991).

**2. Permissibility of Separate Sentences**

Under the test enunciated in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), a defendant convicted of violating two separate criminal provisions will not be punished twice for the same offense in violation of the double jeopardy clause of the fifth amendment if "each provision requires proof of a fact which the other does not." See also *Rutledge v. United States*, — U.S. —, —, 116 S.Ct. 1241, 1245, 134 L.Ed.2d 419 (1996) (same). White concedes that section 1962(d)[18] requires proof of facts (*e.g.*, the existence of an enterprise) not required for a conviction under

---

15. Only one defense counsel (on behalf of all defendants) was allowed to speak to juror no. 10, who was to be informed that she could decline to be interviewed.

16. This argument also applies to Hicks, who has adopted his co-appellants' arguments to the extent they apply to him. Hicks Br. 21.

17. The sentences of incarceration for the drug conspiracy and the RICO conspiracy run concurrently but each carries a $50 special assessment.

18. Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provi-

sions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*Id.* § 1962(c). "Racketeering activity" includes a variety of felonies, including "dealing in a controlled substance or listed chemical" punishable under state or federal law. *Id.* § 1961(1)(A), (D).

section 846 [19] but argues that the converse is not true. In White's view, all facts that must be proved to establish a section 846 conspiracy must also be proved to establish a RICO conspiracy "through drug trafficking," White Br. 28, and the former therefore is a lesser included offense of the latter. The government responds that section 846 should be compared to RICO on its face rather than as applied in a particular case. Because drug trafficking is only one of the many felonies that can form the basis of a RICO conspiracy, the government contends that a drug conspiracy need not be proved to establish (and therefore is not a lesser included offense of) a RICO conspiracy.[20]

The government is correct that under the *Blockburger* test we examine each relevant statute on its face. In *United States v. Coachman*, 727 F.2d 1293 (D.C.Cir. 1984), in affirming consecutive sentences for theft and for making false claims arising from the same transactions, we observed that the Supreme Court "has stated unqualifiedly that 'application of the [*Blockburger*] test focuses on the statutory elements of the offense.'" *Id.* at 1301 (quoting *Iannelli v. United States*, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293–94, n. 17, 43 L.Ed.2d 616 (1975)). We therefore rejected the argument that, in applying the *Blockburger* test, the court "should look, not to the statutorily-specified elements of the offenses, but rather to the facts of the case as alleged in the indictment and established by the evidence." *Coachman*, 727 F.2d at 1301. While the government is correct that each statute should be examined on its face, the question remains how to read a statute listing several alternative sub-offenses. The Supreme

Court answered this question in *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980), holding that cumulative sentences could not be imposed for rape and felony murder if rape is the felony at issue. Although the felony murder statute "proscribe[d] the killing of another person in the course of committing rape *or* robbery *or* kidnaping *or* arson, etc.," the Court characterized the homicide offense not as felony murder but as "killing in the course of a rape." *Id.* at 694, 100 S.Ct. at 1439. The Court explained that it was not looking "to the facts alleged in a particular indictment" and acknowledged that rape is not always a lesser included offense of felony murder—for example, if the felony is robbery. *Id.* at 694 & n. 8., 100 S.Ct at 1439 & n. 1439 Nevertheless, it found determinative that "[i]n the present case ... proof of rape is a necessary element of proof of the felony murder." *Id.* at 694, 100 S.Ct. at 1439. An offense thus constitutes a lesser included offense even if it overlaps with only one of several offenses listed in the statute criminalizing the greater offense. This result makes sense. A statute criminalizing several types of felony murder, for example, is functionally equivalent to several statutes each criminalizing a single type of felony murder.

As to White's claim, it matters not that drug trafficking is only one of several listed felonies that can form the basis of a RICO conviction. Because it is the predicate felony at issue in this case, the RICO statute should be read to exclude the other possible predicate felonies. See *United States v. Kragness*, 830 F.2d 842, 863–64 (8th Cir.1987). Reading RICO in this way, we believe there was no fact required to prove the drug con-

---

**19.** Section 846 provides:
Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
21 U.S.C. § 846.

**20.** Our sister circuits have split over whether a drug conspiracy is a lesser included offense of a RICO conspiracy. Compare *United States v. Kragness*, 830 F.2d 842, 864 (8th Cir.1987) ("[P]roof of the RICO conspiracy in fact rested upon proof of the drug conspiracies, and not upon proof of an agreement that some other

predicate offenses would be committed.") and *United States v. Johnson*, 911 F.2d 1394, 1398 (10th Cir.1990) with *United States v. Thomas*, 757 F.2d 1359, 1371 (2d Cir.1985) ("[A] RICO conspiracy charge is satisfied by proof of an agreement to commit a felony, no proof of conspiracy to commit narcotics violations is necessary."), *cert. denied*, 479 U.S. 818, 107 S.Ct. 78, 93 L.Ed.2d 34 (1986), 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 54 (1985), and *United States v. Mitchell*, 777 F.2d 248, 264 (5th Cir.1985) (same), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986), 475 U.S. 1096, 106 S.Ct. 1493, 89 L.Ed.2d 895 (1986).

spiracy that was not also required to prove the RICO conspiracy. Accordingly, just as rape was a lesser included offense of felony murder in *Whalen*, so the drug conspiracy is a lesser included offense of the RICO conspiracy here.

 The story, however, does not end there. Even if one crime is a lesser included offense of another, punishments may be imposed for both "if Congress intended that they be imposed." *United States v. Baker*, 63 F.3d 1478, 1494 (9th Cir.1995), *cert. denied*, —— U.S. ——, ——, 116 S.Ct. 824, 921, 133 L.Ed.2d 767, 850 (1996); see also *Garrett v. United States*, 471 U.S. 773, 779, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985) ("[T]he *Blockburger* presumption must of course yield to a plainly expressed contrary view on the part of Congress."); *United States v. Crosby*, 20 F.3d 480, 483–84 n. 9 (D.C.Cir. 1994), *cert. denied*, 514 U.S. 1052, 115 S.Ct. 1431, 131 L.Ed.2d 312 (1995), 513 U.S. 883, 115 S.Ct. 221, 130 L.Ed.2d 148 (1994). As a number of circuits have recognized, RICO is intended to supplement, rather than replace, existing criminal provisions. *Baker*, 63 F.3d at 1494; *United States v. Deshaw*, 974 F.2d 667, 671–72 (5th Cir.1992); *Kragness*, 830 F.2d at 864. The RICO statute itself provides that "nothing in [RICO] shall supersede any provision of Federal . . . law imposing criminal penalties . . . in addition to those provided for [here]." Organized Crime Control Act of 1970, Pub.L. No. 91–452, § 904(b), 84 Stat. 922, 947 (1970). Instead, "separate statutes set forth the [drug and RICO conspiracy offenses], and are intended to deter two different kinds of activity, i.e., conspiracy to engage in racketeering as opposed to conspiracy to violate narcotics laws." *Deshaw*, 974 F.2d at 672. As a result, the circuits that have held drug conspiracies to be lesser included offenses of RICO conspiracies or have not resolved the issue nevertheless allow cumulative sentences to stand on the ground that the Congress "intended to permit, and perhaps sought to encourage, the imposition of cumulative sentences for RICO offenses and the underlying crimes." *Kragness*, 830 F.2d at 864; see also *Deshaw*, 974 F.2d at 672. We likewise conclude that, although the drug conspiracy is a lesser included offense of the RICO conspiracy, cumulative punishments are authorized.

The remaining sentencing issues raised by White, Hutchinson and Hughes do not merit discussion.