**UNITED STATES of America,**
**Plaintiff,**

v.

**Robert B. LEDBETTER,**
**et al. Defendants.**

Case No. 2:15–CR–080, Case
No. 2:14–CR–127

United States District Court,
S.D. Ohio, Eastern Division.

Signed November 4, 2015

Brian Martinez, David Devillers, Kevin W. Kelley, U.S. Attorney's Office, Columbus, OH, for Plaintiff.

Richard Allen Cline, Cline, Mann & Company LLC, Powell, OH, Kort W. Gatterdam, Carpenter Lipps & Leland LLP, S. Michael Miller, Kegler Brown Hill & Ritter, Kirk A. McVay, Office of the Ohio Public Defender, Jeffrey Allen Berndt, Kevin Patrick Durkin, Isabella Dixon, Gregory William Meyers, Columbus, OH, for Defendants.

### OPINION & ORDER

ALGENON L. MARBLEY, UNITED STATES DISTRICT JUDGE

This matter comes before the Court on Defendant Robert B. Ledbetter's motion to suppress statements that his former girlfriend, Crystal Fyffe, allegedly made to her attorney and to law enforcement personnel during and in preparation for a debriefing regarding Ledbetter's role in the 2007 murder of Rodriccos Williams. (Doc. 703). Ledbetter argues that the admission of Fyffe's statements at trial would violate his Confrontation Clause rights because Fyffe is dead and therefore unavailable to testify. (*Id.*). The Court has scheduled an evidentiary hearing to adjudicate this matter on November 17, 2015, but issues this Opinion and Order in advance to provide some ground-rules for that proceeding.

### I. BACKGROUND

Ledbetter is one of twenty defendants facing trial for his alleged involvement in the Short North Posse, an alleged criminal

organization that operated in the Short North area of Columbus, Ohio, from 2005 until 2014. He faces nine charges, including one count of RICO conspiracy, four counts of murder in aid of racketeering, two counts of murder through use of a firearm during and in relation to a drug trafficking crime, one count of use of a firearm during and in relation to a crime of violence, and one count of conspiracy to murder a witness.

Two interrelated murders underpin this motion to suppress: (1) the November 3, 2007 murder of Rodriccos Williams (in Pickerington), and (2) the October 19, 2011 murder of Crystal Fyffe (in Columbus). A brief recounting of both murders follows.

### A. The 2007 Murder of Rodriccos Williams

The Government alleges that Ledbetter, along with several other Short North Posse members, stole money, jewelry, and marijuana from Rodriccos Williams during a home invasion and robbery in Pickerington, Ohio, on November 3, 2007. (Doc. 300). During the course of the robbery, Williams was shot and killed.

Police officers investigating the Williams murder turned their attention to Ledbetter. During the course of their investigation, the officers spoke to Crystal Fyffe, whom at the time was Ledbetter's girlfriend. Investigators suspected that Fyffe might have concealed or destroyed evidence of the Williams murder at Ledbetter's request. Concerned that police would implicate her in the murder, Fyffe retained an attorney, Stephen Palmer, to represent her in May 2011. Fyffe and Palmer had several attorney-client conversations about various issues, including her knowledge of the Williams murder and other criminal activity. Although Ledbetter was in jail at the time for marijuana trafficking, Fyffe allegedly feared for her safety and expressed concern that Ledbetter was going to have her killed. She was

so scared that she purportedly considered moving to Youngstown to avoid Ledbetter and his associates.

Fyffe's concerns seemed well-founded. The discovery produced to date indicates that, when she previously tried to end their relationship, Ledbetter tied her up and shot her. Fyffe attempted to protect her face with her hands, and the bullet hit her left hand. When police officers visited Fyffe in the hospital, she allegedly lied about the source of her injuries for fear of Ledbetter's retribution.

In July 2011, Fyffe and Palmer met with the Fairfield County prosecutor handling the Williams murder. Fyffe provided information about the events surrounding the murder and about other crimes of which she was aware. Around that time, Fyffe began receiving letters and telephone calls from Ledbetter (who was still in jail) warning her not to talk to law enforcement.

### B. The 2011 Murder of Crystal Fyffe

On the evening of October 19, 2011, Fyffe left her home in the Hilltop area to pick up a pizza for her mother, her eleven-year old daughter, and herself. A few minutes after Fyffe exited the residence, her mother heard a gunshot. She ran outside and found Fyffe, who was unconscious, lying on the walkway. Fyffe had been shot near the base of her skull, and a pool of blood surrounded her head. After a neighbor called the police, officers responded to the scene and found a Donato's pizza box, two cell phones, and a set of keys strewn about Fyffe's body. She had not, however, been robbed. Police later discovered a spent 9mm shell casing a short distance from her body. Fyffe was pronounced dead just before 8:00 p.m. The coroner's report listed her cause of death as a single gunshot to the back of her neck that severed her spinal cord and struck the bottom of her brain cavity.

Just seconds before being shot, Fyffe had been talking on her cell phone to a friend, Melissa Leslie. When Leslie heard the phone drop and then heard screams in the background, she rushed to the victim's home. A police officer who had responded to the scene asked Leslie if she was aware of anyone who would want to hurt her friend, and Leslie allegedly stated, "Crystal had always told [me] that if anything ever happened to her that her boyfriend Brandon was responsible."[1] Leslie allegedly explained to the officer that Ledbetter wanted Fyffe killed because she was going to testify against him in an upcoming trial regarding a home invasion.

A few days later, police officers contacted Fyffe's attorney and informed him that his client had been murdered. Her attorney allegedly responded, "She told me this was going to happen." The Government contends that it has other evidence and witness testimony which prove that Ledbetter conspired to murder Fyffe to prevent her from cooperating with authorities.

Ledbetter stands accused of both murders. The Superseding Indictment charges him with two substantive counts related to the Williams murder: (1) murder in aid of racketeering; and (2) murder through the use of a firearm during and in relation to a drug trafficking crime. (Doc. 300, Counts 9–10). The Superseding Indictment also charges Ledbetter with two substantive counts related to the Fyffe murder: (1) murder in aid of racketeering; and (2) conspiracy to murder a witness with the intent to prevent her from providing information to law enforcement regarding the commission of murder and other crimes. (Id., Counts 29–30). Finally, the Superseding Indictment lists both murders as overt acts taken in furtherance of the overarching RICO conspiracy. (Id., Overt Acts 48 and 84).

## C.  The Instant Motion to Suppress

Ledbetter now moves to suppress any "evidence of statements Ms. Fyffe allegedly made to law enforcement and her attorney during and in preparation for debriefings as a [confidential informant] for law enforcement." (Doc. 703). He argues that the admission of such evidence would violate his rights under the Confrontation Clause of the Sixth Amendment because Fyffe is no longer available to testify and, thus, would not be subject to cross-examination. In short, Ledbetter contends that Fyffe's statements qualify as "testimonial" statements, and therefore are barred under the Confrontation Clause because she made them "to establish or prove past events potentially relevant to [a] later criminal prosecution." (Id. (quoting Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006))).

## II.  LEGAL STANDARDS

■ The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. In Crawford v. Washington, 541 U.S. 36, 53–54, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court marked a sea change in Sixth Amendment jurisprudence by holding that the Confrontation Clause presents an absolute bar to the admission of out-of-court "testimonial" statements unless the person making the statement is unavailable to testify and the defendant had a prior opportunity for cross-examination. Crawford and a follow-on case, Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), made clear that the Confrontation Clause protects only against out-of-court "testimonial" statements, regardless of their reliability. See

---

1.  Ledbetter's middle name is Brandon, and he commonly went by that name.

*Whorton v. Bockting,* 549 U.S. 406, 420, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007).

■ Despite the doctrinal shift that *Crawford* and *Davis* ushered in, they expressly preserved one long-standing exception to the Confrontation Clause: the forfeiture-by-wrongdoing rule. *Crawford,* 541 U.S. at 62, 124 S.Ct. 1354 ("[T]he rule of forfeiture by wrongdoing *(which we accept )* extinguishes confrontation claims on essentially equitable grounds ...."(emphasis added)); *Davis,* 547 U.S. at 833–34, 126 S.Ct. 2266 ("*Crawford* ... did not destroy the ability of courts to protect the integrity of their proceedings"; "[O]ne who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation."). As the Supreme Court reaffirmed in *Davis,* "the Sixth Amendment does not require courts to acquiesce" in defendants' attempts to "undermine" judicial proceedings by procuring or coercing silence from potential witnesses. *Davis,* 547 U.S. at 833, 126 S.Ct. 2266. Thus, in the wake of *Crawford* and *Davis,* a defendant "forfeit[s] his right to confront [a] witness" if that witness was "unavailable to testify" because the defendant "killed or intimidated her." *United States v. Cromer,* 389 F.3d 662, 679 (6th Cir.2004); *see also United States v. Garcia–Meza,* 403 F.3d 364, 370 (6th Cir.2005) (finding forfeiture by murder).

■ The Supreme Court later refined the forfeiture-by-wrongdoing rule in *Giles v. California,* 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008). There, the Court reasoned that merely committing a wrongful act that renders a witness unable to testify does not trigger forfeiture of the right to confrontation. Instead, the Court concluded that the forfeiture rule applies only when "the defendant [also] *intended* to prevent a witness from testifying." *Id.* at 361, 128 S.Ct. 2678 (emphasis added). In other words, "the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable." *Id.* at 367, 128 S.Ct. 2678. *Giles* thus partly overruled Sixth Circuit precedent, which did not at that time impose an intent requirement. *See Garcia–Meza,* 403 F.3d at 370 ("There is no requirement that a defendant ... only forfeits his right to confront the witness where ... he intended to prevent the witness from testifying.").

### A. Required Evidentiary Showing

■ The *Giles* Court did not articulate the required evidentiary showing by which the government must demonstrate forfeiture by wrongdoing. Nevertheless, in *Davis,* the Supreme Court favorably referenced the procedures that courts employ under Federal Rule of Evidence 804(b)(6), "which codifies the forfeiture doctrine." 547 U.S. at 833, 126 S.Ct. 2266. Thus, to show that Ledbetter waived his right to confrontation, the Government must demonstrate by a preponderance of the evidence both that Ledbetter rendered Fyffe "unavailable" to testify and that he engaged in conduct *designed* to ensure her unavailability. *Id.; see also Beckett v. Ford,* 384 Fed.Appx. 435, 448 (6th Cir. 2010). The Government need not show that silencing Fyffe was Ledbetter's "sole purpose." *See United States v. Cazares,* 788 F.3d 956, 975 (9th Cir.2015). Moreover, the Government may rely on hearsay—including Fyffe's statements—to make its required showing *if* the Court resolves this issue at a preliminary evidentiary hearing. *See Davis,* 547 U.S. at 833, 126 S.Ct. 2266; *United States v. Mayhew,* 380 F.Supp.2d 961, 968 n.9 (S.D.Ohio 2005).

■ Two more points bear emphasis. *First,* the preponderance of the evidence standard applies even where, as alleged here, the wrongdoing that triggers the forfeiture rule is the same conduct for which

the defendant will stand trial. As this Court has explained, "a defendant forfeits his Confrontation Clause rights if the court determines by a preponderance of the evidence that the declarant is unable to testify because the defendant intentionally murdered her, regardless of whether the defendant is standing trial for the identical crime that caused the declarant's unavailability." *Mayhew*, 380 F.Supp.2d at 968; *see also Giles*, 554 U.S. at 374 n. 6, 128 S.Ct. 2678 (plurality opinion) (noting that trial judges must make a preliminary evidentiary ruling on forfeiture by wrongdoing when a defendant is on trial for murdering a witness to prevent her testimony); *Giles*, 554 U.S. at 379, 128 S.Ct. 2678 (Souter and Ginsburg, JJ., concurring in part) (agreeing that equity permits forfeiture "when a defendant is prosecuted for the very act that causes the witness's absence, homicide being the extreme example," due to the separate roles of judges (in admitting the statements under a preponderance of the evidence standard) and juries (in finding guilt beyond a reasonable doubt), so long as there also is a showing of intent).

▮ *Second*, the forfeiture-by-wrongdoing rule applies regardless of whether Ledbetter personally killed Fyffe. The fact that a defendant conspired to have the witness murdered to prevent her from testifying suffices to trigger the forfeiture rule. *See Cazares*, 788 F.3d at 974 ("A number of courts have ruled that a witness's statement may be admissible ... against a defendant conspirator who did not directly procure the unavailability of the witness, so long as a coconspirator had done so, the misconduct was within the scope and in furtherance of the conspiracy, and the misconduct was reasonably foreseeable to the conspirator."); *United States v. Carson*, 455 F.3d 336, 363–64 (D.C.Cir.2006) (explaining that the forfeiture rule applies "with equal force" to a defendant whose co-conspirators rendered the witness unavailable).

## B. Procedures for Determining Forfeiture–by–Wrongdoing

Because *Giles* did not declare the proper procedures for adjudicating forfeiture-by-wrongdoing claims, this Court maintains discretion over *how* and *when* to make those determinations. *See generally* Tim Donaldson, *A Reliable and Clear–Cut Determination: Is a Separate Hearing Required to Decide When Confrontation Forfeiture by Wrongdoing Applies?*, 49 New. Eng. L.Rev. 167 (2015) (discussing different procedures that trial courts have utilized both pre- and post-*Giles* to adjudicate forfeiture-by-wrongdoing claims).

Some jurisdictions require trial courts to conduct a separate evidentiary hearing, outside the presence of the jury, before determining whether a defendant's misconduct waived the right to confrontation. *Id.* at 169–72; *see also United States v. Dhinsa*, 243 F.3d 635, 653–54 (2d Cir.2001); *United States v. Cherry*, 217 F.3d 811, 815 (10th Cir.2000). Other jurisdictions, however, take a more flexible approach and permit trial courts to borrow the procedures used in co-conspirator cases to make forfeiture determinations. Donaldson, *supra*, at 172–76; *see also United States v. Baskerville*, 448 Fed.Appx. 243, 249–50 & n. 5 (3d Cir.2011); *United States v. Emery*, 186 F.3d 921, 926 (8th Cir.1999); *United States v. White*, 116 F.3d 903, 915–16 (D.C.Cir.1997) (per curiam). Under the latter approach, trial courts may adjudicate forfeiture-by-wrongdoing claims in one of three ways: (1) at a "mini-hearing," without the jury present, where the unavailable witness's statements may be considered; (2) at trial, after the government has established forfeiture by a preponderance of the evidence *without* relying on the unavailable witness's statements; or (3) by

conditionally admitting the unavailable witness's statements at trial subject to a later showing of their admissibility. *See White,* 116 F.3d at 915; *cf. United States v. Vinson,* 606 F.2d 149, 152–53 (6th Cir. 1979) (describing available procedures for determining admissibility of out-of-court statements from co-conspirators).

The Sixth Circuit has not delineated the proper procedures for adjudicating forfeiture-by-wrongdoing claims. This Circuit has, however, analogized the required evidentiary showing for forfeiture claims to the required showing for out-of-court statements from co-conspirators. *See Steele v. Taylor,* 684 F.2d 1193, 1202–03 (6th Cir.1982) (requiring the government to make the required preliminary showing by a preponderance of the evidence for extra-judicial statements of unavailable witnesses and co-conspirators alike). Moreover, the Sixth Circuit recently affirmed the denial of a habeas corpus petition based on an alleged Confrontation Clause violation where the state court admitted the unavailable witness's statements due to "circumstantial evidence presented at trial" that showed the defendant had "effectively procured [the witness's] absence," thus triggering forfeiture-by-wrongdoing. *Buckman v. Beckstrom,* 622 Fed.Appx. 551, 555–56, No. 14–6070, 2015 WL 4773277, at *4 (6th Cir. Aug. 14, 2015). In other words, the Sixth Circuit approved of the second method described above, whereby courts make the forfeiture-by-wrongdoing determination at trial, after the government has established such forfeiture by a preponderance of the evidence, without relying on the unavailable witness's statements. *See id.*

These cases—coupled with the Sixth Circuit's view that trial judges "must have considerable discretion in controlling the mode and order of proof at trial" and in choosing between "alternative means" for deciding threshold evidentiary matters—suggest that this Circuit would permit trial courts to borrow the methods used in co-conspirator cases to make forfeiture determinations. *See Vinson,* 606 F.2d at 152. Indeed, in the absence of controlling precedent, lower courts within the Sixth Circuit have taken a variety of approaches in adjudicating forfeiture-by-wrongdoing claims, further suggesting that "it may not be possible to establish a hard and fast procedure for making [these] determinations." *See* Donaldson, *supra,* at 198.

For example, in *Mayhew,* this Court employed the "mini-hearing" approach and made a pre-trial finding that the defendant's misconduct amounted to forfeiture by wrongdoing. 380 F.Supp.2d at 963, 966–68 ("In sum, the equitable principles outlined in *Crawford,* the jury's ignorance of the court's threshold evidentiary determination, and the analogous evidentiary paradigm of conspiracy permit this Court to make a preliminary finding as to whether Defendant's wrongdoing resulted in the unavailability of the declarant ...."). By contrast, in *United States v. Taylor,* 622 F.Supp.2d 693, 694, 697–98 (E.D.Tenn. 2008), the Eastern District of Tennessee resolved the forfeiture issue at trial, after the government presented its non-hearsay evidence. The court's approach in *Taylor* may have been a function of necessity, as the government informed the court of its intent to rely on the deceased witness's statement just two days before trial, *id.* at 695, but it does underscore the need for a flexible approach, *see* Donaldson, *supra,* at 198 ("A pre-trial forfeiture hearing is not always possible.").

State-court decisions from within the Sixth Circuit likewise permit a flexible approach as to the timing of any forfeiture-by-wrongdoing determination, although there seems to be a growing consensus that trial courts must hold an evidentiary hearing outside the presence of the jury

before ruling on whether an unavailable witness's statements are admissible. *See Parker v. Kentucky,* 291 S.W.3d 647, 679 (Ky.2009) (holding that trial courts must conduct an evidentiary hearing "before ruling on the admissibility of the proposed hearsay"; indicating that a pre-trial hearing may be preferable "[f]rom a purely procedural standpoint"; but stopping short of requiring a hearing before trial begins); *Tennessee v. Ivy,* 188 S.W.3d 132, 146–48 (Tenn.2006) ("To ensure that the rule is properly applied, however, we further adopt the requirement that the trial court conduct a hearing outside the presence of the jury to determine whether [the unavailable witness's] statements are admissible.").

## III. ANALYSIS

As the foregoing discussion demonstrates, no single formula works best for all situations involving an alleged forfeiture of the right to confrontation. Benefits and drawbacks abound for any procedural approach, thereby requiring flexibility in the hands of trial courts to structure the presentation of evidence based on the particular facts and posture of each case. Accordingly, this Court will borrow from the evidentiary methods used in co-conspirator cases to make forfeiture-by-wrongdoing determinations, thus permitting a determination in the following manners: (1) at a "mini-hearing," outside the presence of a jury, where the unavailable witness's statements may be considered; (2) at trial, after the government has established forfeiture by a preponderance of the evidence without relying on the unavailable witness's statements; or (3) by conditionally admitting the unavailable witness's statements at trial subject to a later showing of their admissibility. *See White,* 116 F.3d at 915; *see also Vinson,* 606 F.2d at 152–53.

### A. Timing of the Forfeiture-by-Wrongdoing Determination

This Court agrees in the abstract that a trial court "promotes justice and judicial economy by engaging any forfeiture-by-wrongdoing issues before trial begins so that the parties and the court can be fully cognizant of the evidence that likely will be presented to the jury." *See Parker,* 291 S.W.3d at 679. Moreover, a pre-trial hearing may also go "a long way towards solving the problem that much of the evidence of the defendant's wrongdoing is in the hands of the unavailable witness." Herb Tanner, Jr., *Forfeiture by Wrongdoing in a Post-Giles World,* 42 Prosecutor 34, 40 (2008) (noting that the Federal Rules of Evidence do not apply in a pre-trial hearing on forfeiture, thus enabling the court to consider the unavailable witness's statements in making the threshold evidentiary determination). These considerations (and others) counsel in favor of a pre-trial hearing.

Then again, witness tampering can occur at any time—and in many instances, occurs "mid-trial"—thus thwarting any "hard and fast procedure for making confrontation forfeiture determinations." *See* Donaldson, *supra,* at 198–99. Moreover, a pre-trial hearing may be wasteful or duplicative where the government has sufficient evidence to prove the defendant's forfeiture independent of the unavailable witness's statements. *Id.* at 196; *see also Baskerville,* 448 Fed.Appx. at 249–50 ("Where, as here, a defendant is charged with killing a witness to prevent him from testifying ... the procedure used ... is an acceptable way to avoid wasting judicial resources by conducting in effect a trial before the trial."); *White,* 116 F.3d at 915–16 (same). Concerns for the safety of other witnesses who may need to testify at a pre-trial hearing also loom large in the sequencing of any forfeiture determination. *See White,* 116 F.3d at 915 ("The

course the court took—permitting the government to keep the identities of the murder witnesses secret until their trial testimony—was considerably less risky than defendants' proposal [for a pre-trial hearing].").  These considerations (and others) counsel in favor of making the determination at trial in some instances.

### B. Presence of the Jury for the Forfeiture–by–Wrongdoing Determination

This Court agrees, however, that regardless of whether a trial court makes its forfeiture determination pre-trial or during trial, "the better practice is to determine whether forfeiture by wrongdoing applies *before* allowing a jury to hear an out-of-court testimonial statement made by an allegedly tampered witness."  Donaldson, *supra*, at 198 (emphasis added).  Put differently, although the Court *may* allow the conditional admissibility of an unavailable witness's statements subject to a later showing of their admissibility through the defendant's misconduct, the Court prefers resolving such matters at a "mini-hearing" (outside the presence of the jury), or during trial, but without resort to bootstrapping off the unavailable witness's statements.

·· Several justifications support this preference.  *First*, preventing the jury from hearing an out-of-court, testimonial statement *until* the court is satisfied that the defendant forfeited his constitutional rights best preserves our nation's dual values of presumed innocence and trial by jury in cases (like this one) in which the wrongdoing that triggers the forfeiture is the same conduct for which the defendant will stand trial.  *See Giles*, 554 U.S. at 374 & n. 6, 128 S.Ct. 2678 (plurality opinion) (noting that a narrow exception is preferable when depriving defendants of their fair-trial rights); *Mayhew*, 380 F.Supp.2d at 968 (explaining the importance of distinct roles that judges and juries must play

in entertaining un-confronted out-of-court statements); *cf.* Donaldson, *supra*, at 176 ("[A]nalogy to procedures used with respect to co-conspirator statements may ... require additional analysis because the law in that area is more complex .... [and] the rationale for justifying admission of co-conspirator statements has shifted post-*Crawford*." (citing *Giles*, 554 U.S. at 374 n. 6, 128 S.Ct. 2678)).

*Second*, conditional admissibility comes with several risks.  If the government cannot prove the connection between the defendant's misconduct and the declarant's unavailability, then "the court must either strike the testimony and instruct the jury to disregard it, or, if that is not enough protection, must grant a mistrial."  *White*, 116 F.3d at 915 (finding that "the better practice," though not required, "was to secure proof ... adequate to sustain admission of the hearsay before the hearsay itself was received").  In some cases, it may prove impossible to "un-ring" the proverbial bell with a curative jury instruction.  Thus, as one commentator has warned, "[p]remature jury exposure to a subsequently stricken accusatory testimonial statement ... presents such great risk of an incurable problem that a court needs to carefully weigh the pros and cons of short-term efficiency against the potential for mistrial, appeal, and multi-level consumption of judicial resources."  Donaldson, *supra*, at 199.

*Third*, deciding the forfeiture issue at a "mini-hearing," without the jury present, or at trial, after having received sufficient, independent evidence of the defendant's wrongdoing, more readily enables trial courts to make their evidentiary rulings without indicating to the jury that the judge has decided the defendant tampered with a witness.  *See id.*; *see also Mayhew*, 380 F.Supp.2d at 968 (noting the importance of "the jury never learn[ing] of the judge's preliminary finding"); *cf. Vinson*,

606 F.2d at 153 (explaining that, in co-conspirator cases, the judge "should refrain from advising the jury of his findings that the government has satisfactorily proved the conspiracy," lest the judge's opinion improperly influence the jury). Put simply, "[t]here is a risk that a jury would be influenced [improperly] by an explanation that the judge has determined a defendant has not only caused the absence of a witness, but also has done so to keep the witness from testifying." Donaldson, *supra*, at 199. Although trial judges can avoid these issues through careful trial management, the use of sidebars, and the like, a "mini-hearing" or resolution at trial without the use of bootstrapping avoids altogether the potential for an unintended and perhaps prejudicial explanation in front of the jury.

## C. This Court's Preferred Approach

█ In sum, this Court agrees with the procedural approach advanced by the Texas Court of Appeals in *Gonzalez v. Texas*, 155 S.W.3d 603, 610 n. 5 (Tex.Ct.App. 2004):

> In future cases, we encourage the trial courts to consider the forfeiture issue at the time they are confronted with a Confrontation Clause objection. When making its forfeiture determination, a court should consider the evidence admitted up to that point in the proceeding and, if necessary, hold a hearing outside the presence of the jury to take additional evidence. If there is sufficient evidence to demonstrate forfeiture, the court should admit the evidence over the defendant's objection and set forth on the record its factual findings that support a forfeiture to allow for a meaningful appellate review of the forfeiture issue.

The Court will apply that approach here and consider the forfeiture issue in its entirety at Ledbetter's suppression hearing, scheduled for November 17, 2015.

This approach makes sense for several reasons. For one thing, the Government learned of the alleged witness tampering well in advance of trial, thereby enabling the Court to promote justice and trial economy by resolving a major evidentiary issue at the outset. *See Parker*, 291 S.W.3d at 679. For another, based on the parties' briefing, it seems that much of the evidence of Ledbetter's alleged wrongdoing rests in the hands (and words) of the now-deceased Crystal Fyffe. A preliminary hearing and resolution of the forfeiture-by-wrongdoing issue will permit the Court to consider her un-confronted out-of-court statements when making this threshold determination, without the jury hearing them. Tanner, *supra*, at 40; *see also Mayhew*, 380 F.Supp.2d at 968 n. 9 ("In making a preliminary determination, the trial court has at its disposal all the information in the record, except privileged information. The jury, of course, only has access to a filtered body of evidence." (citation omitted)). Finally, resolving this matter before trial will enable the Court to issue a reasoned opinion, stating its factual findings in support of (or against) forfeiture, without discussing the matter in front of the jury or improperly influencing their consideration of innocence and guilt. *See Mayhew*, 380 F.Supp.2d at 968.

At the November 17, 2015 hearing, the Government must be prepared to show, by a preponderance of the evidence, that Ledbetter forfeited his Confrontation Clause rights.[2] In other words, the Government

---

**2.** The Court makes no preliminary finding as to whether some (or all) of Fyffe's out-of-court statements are non-testimonial, and therefore not subject to Confrontation Clause protections. *See Bockting*, 549 U.S. at 420, 127 S.Ct. 1173. The Court merely issues this Opinion and Order to provide fair notice to the parties as to the scope of the November 17, 2015 hearing.

must be prepared to show the following: (1) that Ledbetter engaged or acquiesced in wrongdoing; (2) that the wrongdoing was intended (in whole or in part) to procure Fyffe's unavailability; and (3) that the wrongdoing did in fact procure her unavailability. *See, e.g., Cazares,* 788 F.3d at 974; *United States v. Jackson,* 706 F.3d 264, 268 (4th Cir.2013); *Baskerville,* 448 Fed.Appx. at 249; *Dhinsa,* 243 F.3d at 653–54; *Cherry,* 217 F.3d at 820.

Because Ledbetter was in jail at the time of Fyffe's murder, and thus personally unable to fire the shot that killed her, the Government may establish that Ledbetter waived his confrontation rights if a preponderance of the evidence establishes one of the following forms of wrongdoing: "(1) [he] participated directly in planning or procuring [Fyffe's] unavailability through wrongdoing; or (2) the wrongful procurement was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy." *United States v. Dinkins,* 691 F.3d 358, 385 (4th Cir.2012) (citing *Cherry,* 217 F.3d at 820).

Indeed, the Third Circuit recently affirmed a forfeiture-by-wrongdoing ruling where the defendant, who was in prison at the time, "at the very least, acquiesced in [the witness's] murder with an eye toward preventing his conviction." *Baskerville,* 448 Fed.Appx. at 250 & n. 5. There, the evidence showed that: (1) the defendant directed his attorney to pass along the witness's identify to several associates "after identifying him as the informant"; (2) the associates to whom the witness's identify was passed "understood the message to be an instruction from [the defendant] to have [the witness] killed"; and (3) the defendant's cellmate "corroborated as much when he testified that [the defendant] admitted responsibility for the murder because without [the witness], the prosecution had no drug case against him."

*Id.* at 250–51. This evidence "fully demonstrate[d]" the defendant's role "in securing [the witness's] unavailability with the intent to prevent his testimony." *Id.* at 250. The Fourth Circuit likewise has affirmed application of the forfeiture rule where an imprisoned defendant told two of his co-conspirators that a third associate was a cooperating informant, thus resulting in the informant's murder. *See Carson,* 455 F.3d at 363–64 ("[T]he reasons why a defendant forfeits his confrontation rights apply with equal force to a defendant whose coconspirators render the witness unavailable. . . ."). These cases are instructive as to the Government's burden of proof here.

None of this discussion about the timing or procedures the Court intends to use should detract from the heart of the suppression hearing or the Government's traditional burden of going forward at that hearing in its presentation of evidence. Assuming that some of Fyffe's statements qualify as "testimonial" under *Crawford* and its progeny, the Government, as the proponent of those out-of-court statements, bears the burden of proving that the forfeiture-by-wrongdoing rule applies. *Beckett,* 384 Fed.Appx. at 448.

## IV. CONCLUSION

For these reasons, the Court will adjudicate Ledbetter's motion to suppress (Doc. 703) and the Government's opposition (Doc. 718) in full, as described, at the November 17, 2015 pre-trial evidentiary hearing.

**IT IS SO ORDERED.**